1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11

SAN DIEGO DETOX, LLC,

12

Plaintiff,

13

v.

14

DETOX CENTER OF SAN DIEGO LLC, et al.,

15

16

Defendants.

Case No.:  3:22-cv-01145-RBM-DDL

**ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**[Docs. 49, 50]**

**REDACTED**

17
18
19
20

Pending before the Court is Defendants Detox Center of San Diego LLC, Ryan Witt,

21

and Mercedes "Nina" Cornejo's ("Defendants") motion for summary judgment

22

("Defendants' MSJ").  (Doc. 49-1.)  Plaintiff San Diego Detox, LLC ("Plaintiff" or "San

23

Diego Detox") filed an opposition (Doc. 55) and evidentiary objections to Defendants'

24

MSJ (Doc. 56.)  Defendants filed a reply.  (Doc. 65.)  With the Court's permission (Doc.

25

69), Defendants also filed a declaration from attorney Nathan Camuti regarding Plaintiff's

26

seeking voluntary amendments to its U.S. trademark applications by requesting a

27

suspension of the applications pending the outcome of this case (Doc. 71).

28

Also pending before the Court is Plaintiff's motion for summary judgment,

1

permanent injunction, and in the alternative, preliminary injunction ("Plaintiff's MSJ") (Doc. 50).  Defendants filed an opposition to Plaintiff's MSJ.  (Doc. 54.)  Plaintiff filed a reply.  (Doc. 62.)  Defendants filed evidentiary objections to Plaintiff's MSJ.  (Doc. 66.)  Plaintiff filed a response to those evidentiary objections.  (Doc. 67.)

In Plaintiff's MSJ, for its federal service mark infringement and state trade name claims (First and Second Causes of Action), Plaintiff argues its fictitious business name ("FBN") gives it a presumption of exclusive right to use the trade name San Diego Detox.  (Doc. 50 at 22–23.)  Plaintiff then argues its San Diego Detox marks are distinctive and suggestive.  (*Id.* at 23–25.)  Plaintiff contends that, even if the marks are descriptive, they have acquired secondary meaning.  (*Id.* at 25–27.)  Plaintiff further argues that there is a likelihood of confusion between Plaintiff's marks and Defendants' marks.  (*Id.* at 27–33.)  Additionally, Plaintiff contends this Court should enter a preliminary injunction or permanent injunction if summary judgment is granted because (1) Plaintiff has established irreparable harm, (2) the balance of hardships favors the issuance of an injunction, (3) public policy favors an injunction given likely confusion between the marks, and (4) no bond would be required for a preliminary injunction.  (*Id.* at 33–35.)

In Defendants' MSJ, concerning Plaintiff's federal service mark infringement claim (First Cause of Action), Defendants argue Plaintiff failed to prove the existence of a valid trademark because its marks are not registered with the United States Patent and Trademark Office ("USPTO") and the marks are generic or they are descriptive and lack secondary meaning.  (Doc. 49-1 at 14–24.)  Defendants also argue that a likelihood of confusion is inadequate to form secondary meaning.  (*Id.* at 24–25.)  Defendants further argue that Plaintiff's state trade name claim (Second Cause of Action) fails because Plaintiff's FBN does not entitle it to exclusive use of its marks, Plaintiff fails to meet the secondary meaning standard in California, and FBN registration cannot confer more rights than those available under federal and state trademark law.  (*Id.* at 25–30.)  Lastly, Defendants argue Plaintiff's common law service mark infringement claim (Third Cause of Action) fails due to lack of a valid, protectable trademark.  (*Id.* at 30.)

The Court finds the matter suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1(d)(1).  Defendants' MSJ (Doc. 49-1) and Plaintiff's MSJ (Doc. 50) are **DENIED**.  Plaintiff's motion for a preliminary injunction (Doc. 50) is **GRANTED**.

## I.   BACKGROUND

### A. Parties

Plaintiff San Diego Detox registered the domain name SanDiegoDetox.com on December 14, 2020.  (Doc. 50-1, Declaration of Thomas Hathorn ("Hathorn Decl.") ¶ 2.) Plaintiff registered San Diego Detox, LLC with the California Secretary of State on June 9, 2021.  (*Id.*)  Plaintiff filed a Fictitious Business Name ("FBN") on May 27, 2022, prior to Defendants.  (Joint Statement of Disputed and Undisputed Facts ("SODUF") at 32.)[1] Plaintiff first obtained its license to operate an adult alcoholism or drug abuse recovery or treatment facility in September 2022.  (*Id.* at 9.)  Plaintiff's detoxification facility is in the City of Lakeside in San Diego County.  (*Id.* at 6.)  Plaintiff and Defendants provide intoxicating or substance addiction related detoxification and residential treatment services for a variety of addictive substances.  (*Id.* at 7.)  On Plaintiff's website, it describes its services as "Detox in America's Finest City."  (Doc. 49-11 (Ex. 9) at 1.)

Plaintiff accepted its first patient at the start of September 2022, and Defendants accepted their first patient in October 2022, with 30 and 15 patients each their opening month, respectively.  (SODUF at 22.)  As of September 25, 2023, approximately 70 percent of San Diego Detox's actual customers are from Southern California.  (Doc. 50-1, Hathorn Decl. ¶ 12.)

Defendants' facility, Detox Center of San Diego, is in the City of San Diego in San Diego County.  (SODUF at 25.)  The California Secretary of State registered Defendants' LLC, Detox Center of San Diego, LLC, on October 25, 2021.  (SODUF at 32.)  That date

---

[1] From the SODUF, the Court only cites those statements that the parties deemed "undisputed."

is the same date Defendants first considered the name Detox Center of San Diego, LLC. (Doc. 50-4 (Ex. 5) Response to Interrogatory No. 2.)   Defendants adopted that name because Detox Center of San Diego "is a detoxification treatment facility located in San Diego, the phrasing is advantageous for Search Engine Optimization, and the name is distinct from other detoxification providers in the San Diego area."   (*Id.* Response to Interrogatory No. 3.)   Sixty five percent of Detox Center of San Diego's patients come from San Diego County.  (Doc. 50-4 (Ex. 8) Deposition of Mercedes Ciara Nina Cornejo ("Cornejo Dep.") 78:15–19.)   55 percent of Detox Center of San Diego's patients are referred from other drug rehabs and doctors.  (*Id.* 80:2–14.)

**B. Alleged Marks**

Plaintiff's word mark "San Diego Detox" is a composite mark containing the words "San Diego" and "Detox."   (SODUF at 2, 5.)   The word "Detox" refers to various detoxification services.  (*Id.* at 5.)   The word "San Diego" is geographically descriptive of Plaintiff's county.  (*Id.* at 6.)

Defendants' stylized mark and Plaintiff's stylized mark appear, respectively, as:

   

(Doc. 50-5 (Ex. 19) at 111, 114.)

**C. USPTO Applications**

**1. Word Mark**

On May 24, 2022, Plaintiff submitted a trademark application, Serial Number 97425332, to register the word mark "San Diego Detox" with the USPTO ("USPTO App. '332").  (Doc. 49-2, Declaration of Nathan Camuti ("Camuti Decl. 1") ¶ 4.)  On May 13, 2023, the USPTO refused registration of Plaintiff's word mark.  (Doc. 49-3 (Ex. 1).)  The USPTO explained, under the Trademark Act Section 2(e)(2), "[r]egistration is refused because the applied-for mark is primarily geographically descriptive of the origin of

applicant's goods and/or services." (*Id.* at 2.)  The USPTO explained "[t]he primary significance of SAN DIEGO is a geographic location, namely, a city in the state of California" and Plaintiff's services originate in San Diego. (*Id.* at 2–3.)  The USPTO went on that "[t]he additional wording DETOX is highly descriptive or generic as applied to the applicant's services.  The attached evidence from Merriam-Webster shows this wording means detoxification from intoxicating or addictive substance.  Thus, the wording merely describes applicant's services because the services are for the purpose and/or related to the detoxification from intoxicating or addictive substance." (*Id.* at 3.)  The USPTO also explained that Plaintiff "is advised that, if the application is amended to seek registration on the Principal Register under Trademark Act Section 2(f) or on the Supplemental Register, applicant will be required to disclaim 'DETOX' because such wording appears to be generic in the context of applicant's goods and/or services." (*Id.*)[2]

Plaintiff responded to the USPTO's decision that it "is complying with the [US]PTO's requirement that the city name SAN DIEGO be disclaimed as the origin of Applicant's services provided under the Mark, but for the reasons set forth in this response, Applicant respectfully submits that the DETOX portion of the Mark is not merely descriptive of the underlying services." (Doc. 49-6 (Ex. 4) at 1.)  Plaintiff argued "that the [US]PTO arbitrarily chose to assign one meaning of the word 'DETOX' to support its refusal, disregarding the numerous other definitions that often are attributed to the word, thereby overlooking the important distinctive features of the Mark." (*Id.* at 2.)  Plaintiff explained Detox "describes a process of getting rid of unhealthy or toxic chemicals, substances, beliefs, habits, or computer viruses" and pointed to other registered marks containing the word detox filed with the USPTO.  (*Id.* at 2–32.)

### 2. Stylized Mark

On May 24, 2022, Plaintiff submitted a trademark application, Serial Number

---

[2] As explained *infra* at III.B.2.i.a, Plaintiff's objection to this exhibit (Doc. 56 at 2) is overruled.

97425191, to register the stylized mark for its "San Diego Detox" logo with the USPTO ("USPTO App. '191"). (Doc. 49-2, Camuti Decl. 1 ¶ 5.) On May 13, 2023, the USPTO refused registration of Plaintiff's stylized mark. (Doc. 49-4 (Ex. 2).) The USPTO explained Plaintiff "must disclaim the wording 'SAN DIEGO' because it is primarily geographically descriptive of the origin of applicant's goods and/or services." (*Id.* at 2.) The USPTO also explained Plaintiff "must disclaim the wording 'DETOX' because it is merely descriptive of an ingredient, quality, characteristic, function, feature, purpose, or use of applicant's goods and/or services." (*Id.*) The USPTO allowed Plaintiff to respond with a disclaimer as follows: "[n]o claim is made to the exclusive right to use 'SAN DIEGO DETOX' apart from the mark as shown." (*Id.*)[3] Plaintiff responded to the USPTO's decision with a similar response to that provided concerning its word mark. (Doc. 49-5 (Ex. 3) at 1–32.)

On November 3, 2023, Plaintiffs voluntarily filed amendments to their trademark applications requesting suspension pending the outcome of this case; the USPTO suspended consideration on November 6, 2023. (Doc. 71, Declaration of Nathan Camuti ("Camuti Decl. 2") at 2.)

**D. Google Searches**

As of September 25, 2023, there were as many as five third-party facilities using "Detox San Diego," one of which is run by Defendant Witt. (SODUF at 22.)[4]

---

[3] As explained *infra* at III.B.2.i.a, Plaintiff's objection to this exhibit (Doc. 56 at 2) is overruled.

[4] Defendants' Google search on September 25, 2023 was for "san diego detox" and included at least five detoxification or rehabilitation facilities describing their services as Detox in San Diego. (Doc. 49-4 (Ex. 7).) Plaintiff objects that this exhibit is irrelevant as it is not probative of what a Google search would have returned prior to September 25, 2023. (Doc. 56 at 3.) Plaintiff's objection is overruled. *See US E.E.O.C. v. Placer ARC*, 114 F. Supp. 3d 1048, 1052 (E.D. Cal. 2015) ("Because the court does not rely on irrelevant evidence when considering motions for summary judgment, such objections are redundant to the practice of summary judgment itself.").

**E. Plaintiff's declarations and depositions**

    **1. Thomas Hathorn (Plaintiff's CEO)**

On June 21, 2023, Thomas Hathorn, Plaintiff's CEO, was deposed. (Doc. 49-14 (Ex. 12) Deposition of Thomas Hathorn ("Hathorn Dep.") at 1.) Hathorn explained Chantal Lessard came up with the name San Diego Detox sometime in 2020. (*Id.* at 46:11–47:3.) Hathorn thought the name was a genius idea because "we're a detox facility in San Diego, and it's a great marketing strategy. It says everything we want it to say." (*Id.* at 47:4–16.) When asked if he believed the name San Diego Detox was descriptive, Hathorn explained he believes it is because he provides detox services in San Diego. (*Id.* at 47:17–48:2.) Hathorn explained that detox in relation to San Diego Detox means a "medically contained, controlled environment to get people off of drugs or alcohol." (*Id.* at 48:13–18.)

Hathorn believed the first time the name San Diego Detox was used in advertising was when his business development person, Max Kuzminsky, started spreading the word through his channels of marketing. (*Id.* at 54:12–19.) Hathorn estimated the brochures Kuzminsky passed out were made during the first half of 2022. (*Id.* at 55:19–20.)

Hathorn believed Plaintiff began using paid advertising on the Internet around July 2022, specifically Google AdWords. (*Id.* at 59:22–25, 77:11–20.) Hathorn believed Plaintiff, during the first three months of paid advertising, spent roughly ███████ ████. (Doc. 52-11 (Ex. 25) 76:17–77:5, 77:21–24.) When asked if Plaintiff had done efficient advertising such that if a resident of San Diego were asked about San Diego Detox, they would know it refers to Plaintiff as opposed to other detox services in San Diego, Hathorn responded "There's 3 million people here. I don't know that I would feel comfortable with that, no." (Doc. 49-14 (Ex. 12) Hathorn Dep. 90:9–19.)[5] When asked if

---

[5] Plaintiff objects these lines as irrelevant, speculation, foundation, conclusory, legal opinion/conclusion. (Doc. 56 at 3–4.) Plaintiff's objection is overruled. *See Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 1156–57 (S.D. Cal. 2022) (explaining why

Plaintiff had done enough advertising that he would expect someone to know San Diego Detox is a business, Hathorn responded "No, I would doubt that highly." (*Id.* at 91:21–92:5.)   From July 8, 2022 to July 24, 2023, Plaintiff's business received ███ impressions on Google Ads. (Doc. 52-10 (Ex. 23).)

On September 25, 2023, Hathorn submitted a declaration. (Hathorn Decl. at 1.) In his declaration, Hathorn explained that San Diego Detox's business plan was drafted and refined over a period of months into what became the September 21, 2021 version of the plan ("September 2021 Business Plan"). (*Id.* ¶ 2.)

Hathorn recalled that on September 24, 2021, he met with Defendant Ryan Witt at a cigar lounge and presented Witt the September 2021 Business Plan. (*Id.* ¶ 3.) Hathorn recalled discussing with Witt his plan to use the San Diego Detox name for a new facility to allow for online search engine optimization and natural differentiation from the existing marketplace. (*Id.*) Hathorn recalled Witt concurred it was a good name for search engine optimization. (*Id.*)

During his deposition, Hathorn explained that Witt signed a non-disclosure agreement ("NDA") during this meeting and told Hathorn he was not interested as he was focused on mental health treatment facilities; subsequently, Witt pulled his team together and told them they are opening a detox facility to compete with Hathorn. (Doc. 50-5 (Ex. 25) Hathorn Dep. 40:18–41:5.)   Specifically, Michelle English, a clinical director and business partner at Detox Center of San Diego, told Hathorn about a year later about Witt's team meeting. (*Id.* 41:24–43:11.)

Hathorn explained that on January 20, 2022, he hired a specialized marketing firm, Active Marketing, to carry out two marketing plans (the "January 20, 2022 Plan" and the

_____

objections that statements are irrelevant, lack personal knowledge, are speculative, or qualify as improper legal conclusions, are misplaced on a motion for summary judgment) (citing *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)).

8

"March 23, 2023 Plan") before switching marketing firms in July 2023.  (Hathorn Decl. ¶ 4.) ███████████████████████████████████████████████████████████████ (Doc. 52-3; Doc. 52-4.)  As of September 25, 2023, Plaintiff spent ████████████████ on marketing its trademark. (Hathorn Decl. ¶ 4.)

Hathorn explained San Diego Detox applied for state licensure to admit patients in May 2022.  (*Id.* ¶ 5.)  Hathorn added San Diego Detox's website went live on or before May 22, 2022.  (*Id.* ¶ 8.)  In late May 2022, Hathorn learned Defendants planned to open a detox facility under the name Detox Center of San Diego.  (*Id.* ¶ 9.)  Hathorn called Defendant Cornejo and advised her of the inevitable confusion and inappropriate use of that facility name.  (*Id.*)  Hathorn requested the facility be launched under a different name and offered to pay modest rebranding expenses.  (*Id.*)  Defendant Cornejo had a warm reception, but after checking with Defendant Witt, dismissed it outright.  (*Id.*)

Hathorn has received 15 reports of actual confusion, including reports from referral partners and potential referral partners misstating that the parties' facilities are related, owned by the same person, or partnered up somehow.  (*Id.* ¶ 10.)  Hathorn is aware of at least three or four people confusing the similar names and coming to San Diego Detox. (*Id.*)  In November 2022, a Santee criminal attorney spoke with Plaintiff's staff believing she was calling Cornejo's facility.  (*Id.* ¶ 11.)  On July 5, 2023, Hathorn received texts from Jacob Alonzo, Director of Outreach and Admissions at Pacific Bay Recovery, reporting a patient attempting to poach patients from Alonzo's facility to Detox Center of San Diego, but confusing the parties' facilities.  (*Id.* ¶ 10; Doc. 50-4 (Ex. 6) at 125–26.)

### 2. Max Kuzminsky (Former Head of Business Development)

On June 11, 2023,[6] Plaintiff's former Head of Business Development from March to August 2022, Max Kuzminsky, submitted a declaration.  (Doc. 55-3 (Ex. 28) Declaration

---

[6] While the declaration is signed for the date of June 11, 2022, many of the events discussed are from later in 2022.  Thus, the Court deduces the declaration is from June 11, 2023.

of Max Kuzminsky ("Kuzminsky Decl. 1") ¶ 2.)[7]  Kuzminsky explained that, from March through August 2022, his marketing efforts were spent on reaching out to the Southern California referral community because many patients come from referral partners in the form of attorneys, hospitals, other treatment facilities, and counseling services.  (*Id.* ¶¶ 6–7.)  During March and April 2022, Kuzminsky's efforts were focused on strategic messaging to trusted contacts of Plaintiff and its employees.  (*Id.* ¶ 8.)  During May through August 2022, Kuzminsky continued to connect with members of the drug recovery community from San Diego to North Los Angeles concerning San Diego Detox and provided tours of its Lakeside facility and handed out hundreds of brochures.  (*Id.* ¶¶ 9–13.)  Kuzminsky also marketed to personnel in charge of employee assistance programs ("EAPs"), including attending a major EAP conference in May 2022, and sent email communications to contacts through the SanDiegoDetox.com email address.  (*Id.* ¶¶ 14–15.)  Kuzminsky believed that "[a]s a result, by the end of July 2022 (and even before), San Diego Detox was well-known in the relevant drug rehabilitation marketplace and known by its 'San Diego Detox' name."  (*Id.* ¶ 16.)  This belief was based on Kuzminsky's personal knowledge from meetings and conversations with over a hundred referral partners up until August 2022 and others in the drug rehab community.  (Doc. 55-8 (Ex. 33) Supplemental Declaration of Max Kuzminsky ("Kuzminsky Decl. 2") ¶¶ 5–6.)

On June 22, 2023, Kuzminsky was deposed.  (Doc. 49-15 (Ex. 13) ("Kuzminsky Dep.") at 1.)  Kuzminsky explained the business relationships he developed were with referral partner businesses, not potential individual clients.  (*Id.* at 12:24–13:6.)  Kuzminsky was not aware of any unsolicited media coverage, online articles, or printed

---

[7] Defendants object Kuzminsky's declaration is irrelevant as to his statements pertain to before September 2022.  (Doc. 66 at 38.)  Defendants' objection is overruled.  *See Cherewick*, 578 F. Supp. 3d at 1156–57 (explaining why objections that statements are irrelevant, lack personal knowledge, are speculative, or qualify as improper legal conclusions, are misplaced on a motion for summary judgment) (citing *Burch*, 433 F. Supp. 2d at 1119).

publications about San Diego Detox.  (*Id.* at 46:2–11.)  When asked if families of people needing detox would know the business's name is San Diego Detox, Kuzminski said no. (*Id.* at 59:14–22.)  Kuzminsky elaborated that if someone called him for help and he told them about San Diego Detox, they would want to go online and look it up.  (*Id.* at 59:23–60:5.)[8]

### 3.  William Giorgi (Current Director of Business Development)

On June 12, 2023, Plaintiff's Director of Business Development since August 2022, William Giorgi, submitted a declaration.  (Doc. 55-5 (Ex. 30) Declaration of William Giorgi ("Giorgi Decl.") ¶ 2.)[9]  Giorgi stated he experienced "instances of actual confusion amongst referral partners from every level of the treatment spectrum, including detox, residential, and outpatient providers" and encountered such confusion regularly at large marketing events.  (*Id.* ¶¶ 3–4.)  For example, Giorgi recalled the clinical director of Akua Detox confused the two facilities and Akua Detox's director of business development, in February 2023, began referring to Plaintiff as "Hot Boy Billy's Place" to avoid further confusion.  (*Id.* ¶ 5.)  The owner of PH Wellness called Giorgi asking for a former patient of Plaintiff's records and Giorgi noted the owner's confusion when realizing the patient was a former patient of Detox Center of San Diego.  (*Id.* ¶ 6.)  Giorgi explained staff at Shoreline Recovery created list serve group texts with each of Plaintiff and Defendants' names and checks the individuals on the list serve before sending texts to ensure communication with the correct facility.  (*Id.* ¶ 7.)

---

[8] Plaintiff objects these lines as irrelevant, speculation, foundation, conclusory, legal opinion/conclusion.  (Doc. 56 at 3-4.)  Plaintiff's objection is overruled.  *See Cherewick*, 578 F. Supp. 3d at 1156–57 (explaining why objections that statements are irrelevant, lack personal knowledge, are speculative, or qualify as improper legal conclusions, are misplaced on a motion for summary judgment) (citing *Burch*, 433 F. Supp. 2d at 1119).

[9] While the declaration is signed for the date of June 12, 2022, many of the events discussed are from later in 2022 as Giorgi was not employed until August 2022.  Thus, the Court deduces the declaration is from June 12, 2023.

11

### 4. Brittany Romero (Program Director)

On June 12, 2023,[10] Brittany Romero, the Program Director at San Diego Detox, submitted a declaration. (Doc. 55-4 (Ex. 29) Declaration of Brittany Romero ("Romero Decl." ¶ 2.) Romero stated she has received over ten reports of actual confusion between San Diego Detox and Detox Center of San Diego. (*Id.*) Romero recalled, on or around January 5, 2023, a client showed up to San Diego Detox looking to go "to Nina's" and was supposed to go to Detox Center of San Diego. (*Id.* ¶ 3.) On or around February 27, 2023,[11] Romero's husband communicated with a client at Detox Center of San Diego who believed he was at San Diego Detox. (*Id.* ¶ 4.) On or before March 14, 2023, Romero's former client at a prior facility called and explained he was admitted to Detox Center of San Diego and believed she worked there. (*Id.* ¶ 5.)

On June 20, 2023, Romero was deposed. (Doc. 50-5 (Ex. 15) Deposition of Brittany Romero ("Romero Dep.") at 1.) Romero recalled that, a month prior to her deposition, a client that was supposed to be admitted at San Diego Detox showed up at Detox Center of San Diego. (*Id.* 26:22–27:10, 28:21–29:3.) Romero explained that, a week before her deposition, she was speaking to an employee of Detox Center of San Diego who informed her that San Diego Detox had a client in their care for four days that was supposed to be at Detox Center of San Diego. (*Id.* 27:12–19.)

### 5. Steve Ackerman (Operations Director)

On June 13, 2023,[12] Steve Ackerman, Plaintiff's Operations Director, submitted a declaration. (Doc. 55-7 (Ex. 32) Declaration of Steve Ackerman ("Ackerman Decl.") ¶ 2.) On April 5, 2023, Ackerman received a call from an Alcoholics Anonymous meeting hall

---

[10] While the declaration is signed for the date of June 12, 2022, many of the events discussed are from 2023. Thus, the Court deduces the declaration is from June 12, 2023.
[11] While the declaration states February 27, 2022, the Court deduces from context that the date was February 27, 2023.
[12] While the declaration is signed for the date of June 13, 2022, the Court deduces from its contents that the declaration is from June 13, 2023.

owner believing one of San Diego Detox's employees was stealing pain pills; Ackerman corrected the owner and the owner realized she was talking about Cornejo's daughter at Detox Center of San Diego.  (*Id.* ¶¶ 3–7.)

### 6. Chantal Lessard (Director of Business Development at Boardwalk Recovery and Soledad House)

On June 13, 2023,[13] Chantal Lessard, the Director of Business Development at Boardwalk Recovery and Soledad House, submitted a declaration.  (Doc. 55-6 (Ex. 31) Declaration of Chantal Lessard ("Lessard Decl.") ¶ 2.)[14]  Lessard explained she has received over a half dozen reports of confusion between San Diego Detox and Detox Center of San Diego.  (*Id.* ¶ 4.)  In approximately October 2022, Lessard met with the director of business development at Opus Recovery, who mistakenly stated he sent a client to Detox Center of San Diego and expressed confusion when Lessard corrected him that her facility was San Diego Detox.  (*Id.* ¶ 5.)  Around the same time, an employee of Ocean Hills Recovery believed Hathorn and Lessard opened Detox Center of San Diego, and when corrected, explained the names were confusing.  (*Id.* ¶ 6.)  Lessard explained that, through her networking in Southern California, "the reputation of San Diego Detox is as a best-in-class facility.  In contrast, Detox Center of San Diego has a horrible reputation amongst referral partners, including because it is well-known (or believed) in the relevant community that Ryan Witt is still an active drug user despite being upper management level of Detox Center of San Diego."  (*Id.* ¶ 10.)

On June 20, 2023, Lessard was deposed.  (Doc. 50-5 (Ex. 12) Lessard Dep. at 1.) Seven or eight months prior to her deposition, Lessard met with Witt and believed he was under the influence at the time.  (*Id.* at 29:5–30:9.)  Lessard recalls Witt explaining he was

---

[13] While the declaration is signed for the date of June 13, 2022, the Court deduces from its contents that the declaration is from June 13, 2023.

[14] Hathorn owns Boardwalk Recovery and Soledad House.  (Doc. 49-13 (Ex. 11) Deposition of Chantal Lessard ("Lessard Dep.") 7:17–21.)

at war with Hathorn who is suing him, that he does not care if it takes millions of dollars to win the lawsuit against Hathorn, and all the money Hathorn puts to pay-per-click advertising on Google he will steal and benefit from.  (*Id.* at 30:10–17.)

**F. Defendants' declarations and depositions**

**1. Mercedes Ciara Nina Cornejo**

On June 19, 2023, Cornejo was deposed.  (Doc. 50-4 (Ex. 8) Cornejo Dep. at 1.) Cornejo recalled Defendants were going to call their facility San Diego Detox; they had a business meeting and one of her business partners was supposed to purchase that domain name.  (*Id.* 45:17–24.)  Soon after, Cornejo posted an online banner stating, "San Diego Detox opening soon in Pacific Beach."  (*Id.* at 45:25–46:3.)  A friend of Cornejo and Hathorn's informed Cornejo that Hathorn planned to call his facility San Diego Detox, but Cornejo stated "I'm not worried about it.  I already own the domain name."  (*Id.* at 46:4–9.)  Cornejo told this story to a business partner who checked and learned they did not own that domain name, so they got back together and discussed a different name.  (*Id.* at 46:10–15.)  Cornejo recalled during a meeting Ryan Witt explained they should call the facility Detox Center of San Diego because it flowed with Mental Health Center of San Diego, which Witt owned.  (*Id.* at 46:16–21.)  Cornejo explained that, at the time they pivoted to Detox Center of San Diego, they were aware Hathorn had San Diego Detox as the name of his facility.  (*Id.* at 49:8–12.)

When asked whether there would be some percentage of people that get confused by the two similar facility names, Cornejo conceded there could be.  (*Id.* at 54:12–19.) Cornejo experienced three people being confused about the facility names.  (*Id.* at 54:20–24.)  Cornejo recalled one of the confused persons called, said they were coming to her detox facility, and then clarified he was looking for San Diego Detox, which he found through a Google search.  (*Id.* at 55:2–19.)  When asked if Cornejo would change Detox Center of San Diego's name if a survey expert was right that people are likely to be confused, Cornejo answered no.  (*Id.* at 104:7–14.)

///

14

### 2. Ryan Witt

On June 23, 2023, Ryan Witt was deposed.  (Doc. 50-5 (Ex. 17) Deposition of Ryan Witt ("Witt Dep.") at 1.)  Witt denied using any of the confidential information Hathorn disclosed to him during the cigar lounge meeting.  (*Id.* 36:5–12.)  Witt recalled Hathorn explaining to him that he was going to use the name San Diego Detox.  (*Id.* at 43:17–22.)

### 3. Ryan Winberry

On August 23, 2023, Ryan Winberry was deposed.  (Doc. 49-16 (Ex. 16) Deposition of Ryan Winberry ("Winberry Dep.") at 1.)  Winberry explained the name Detox Center of San Diego was chosen because he owns a company called Mental Health Company of San Diego that was around before "all of this" and it made sense to use a similar name. (*Id.* at 57:3–8.)[15]

### 4. 30(b)(6) Witnesses (David Genzler, Adrian Dubiel, Sydney Knauf, Jeron Jache)

On June 22 and 23, 2023, Defendant Detox Center of San Diego's 30(b)(6) witnesses were deposed.  (Doc. 50-4 (Ex. 9) ("30(b)(6) Dep. 1") at 1.)  One 30(b)(6) witness, David Genzler, was not aware of any other San Diego company using the terms Detox and San Diego in its name.  (*Id.* at 64:11–15.)  Another 30(b)(6) witness, Jeron Jache, also was not aware of any other San Diego company using the terms Detox and San Diego in its name. (Doc. 50-4 (Ex. 10) ("30(b)(6) Dep. 2") 105:5–9.)  When asked who owns San Diego Detox other than Nina, Jache listed the other owners of Detox Center of San Diego.  (*Id.* 89:5–6.)  Another 30(b)(6) witness, Sydney Knauf, answered the same question in the same way.

---

[15] Plaintiff objects that the question to Winberry was vague, irrelevant, improper legal opinion/conclusion, speculation/conclusion, and argumentative.  (Doc. 56 at 6.)  Plaintiff's objection is overruled.  *See Cherewick*, 578 F. Supp. 3d at 1156–57 (explaining why objections that statements are irrelevant, lack personal knowledge, are speculative, or qualify as improper legal conclusions, are misplaced on a motion for summary judgment) (citing *Burch*, 433 F. Supp. 2d at 1119).

(Doc. 50-5 (Ex. 11) ("30(b)(6) Dep. 3") 72:20–24.)

**G. Text Messages**

On October 25, 2021, employees of Defendant Detox Center of San Diego proposed using the following LLCs: San Diego detox, San Diego detox treatment, and San Diego detox center. (Doc. 83-2 at 29.) On October 26, 2021, Ryan Winberry texted the group that the facility name is Detox Center of San Diego. (*Id.* at 31.) On April 22, 2022, Defendants explained in text that they bought up a bunch of domain names mentioning "detox or San Diego" and would keep doing so, but also noted "[Hathorn] from boardwalk is trying to buy up [t]he good ones." (*Id.* at 35.) On August 24, 2022, Cornejo texted the group explaining they planned to use the name San Diego Detox but did not find the domain name. (*Id.* at 37.)

On July 29, 2022, Witt texted Hathorn offering to change Detox Center of San Diego's name for $2 million, adding "[i]f not your up against a lot more than you realize [b]ut if 2 million is worth it let's do it." (Doc. 50-4 (Ex. 6) at 77.) Witt added that "Jack doesn't want to take the 2m but I can talk him into it. He's been sober 20 something years and his past life was all organized crime which he left behind a long time ago If not we need to know like ASAP because Jack's legal team is waiting for me to call them." (*Id.* at 78.)

**H. Defendants' Expert Dr. Jacqueline Chorn**

Dr. Jacqueline Chorn, a Director at NERA and member of the Intellectual Property and Survey Research, Design, and Analysis practices, submitted a report in this case. (Doc. 49-14 (Ex. 14) ("Chorn Report") ¶ 1.) Dr. Chorn was asked to determine "whether or not Plaintiff's tradename [San Diego Detox] has acquired secondary meaning among relevant consumers." (*Id.* ¶ 10.) Dr. Chorn designed a survey with 306 respondents (153 in the test group and 153 in the control group) who used or recommended drug/alcohol detox or inpatient rehabilitation services for themselves, a partner, or a close friend/family member in the past year or indicated they were likely to consider it for themselves or recommend it to a partner, close friend or family member in the next year. (*Id.* ¶ 11.) Respondents also

16

needed to indicate they considered or would consider Southern California as a destination for those services.  (*Id.*)  Dr. Chorn's survey asked respondents to "think about drug/alcohol detox or inpatient rehabilitation services and then to assess whether they associate the name 'San Diego Detox' (or 'Lakeside Detox' if assigned to the Control Group) with the services offered by one company or brand, more than one company or brand, no particular company or brand, or to indicate that they did not know / had no opinion."  (*Id.* ¶ 12.)  Dr. Chorn concluded that, "in the context of drug/alcohol detox or inpatient rehabilitation, consumers do not associate the name 'San Diego Detox' with a single source."  (*Id.* ¶ 13.)  Specifically, "a net -0.7 percent of respondents, (essentially 0 percent) associate the name 'San Diego Detox' with one company or brand."  (*Id.*)  Among California residents, the net rate of secondary meaning was 1.5 percent and, among Southern California residents, it was 11.2 percent.  (*Id.* n.3.)

## I. Plaintiff's Rebuttal Expert Dr. Susan Schwartz McDonald

Plaintiff's Rebuttal Expert, Dr. Susan Schwartz McDonald, was retained to review and comment on Dr. Chorn's Report.  (Doc. 55-11 (Ex. 36) ("McDonald Report") ¶ 1.) Dr. McDonald concluded Dr. Chorn's survey "is so gravely deficient, it cannot be relied on for the purpose of disproving the secondary meaning of Plaintiff's mark, nor for any relevant evidentiary purpose whatsoever."  (*Id.* ¶ 4.)  Dr. McDonald believes the key methodological defects of Dr. Chorn's survey include:

- A survey universe improperly defined and incorrectly sampled, both over and under-inclusive for the purpose of secondary meaning measurement in a market context with important geographic parameters, sampled through a defective screening process unable to confirm that respondents are relevant consumers in any part of the country;

- An inapt control whose key word mark element (Lakeside) has been in use by other enterprises and was thus so noisy in its own right that it was almost destined to zero-out any evidence of secondary meaning, even in a survey with a properly drawn sample;

- An inherently ambiguous secondary meaning question that does not allow us to determine what respondents really know or believe about the San Diego

Detox mark and what percentage might ever have encountered the mark at all;

- Failure to fully and correctly analyze verbatim responses, which, when properly examined, attest to the ambiguity of the key close-ended question and highlight the unreliability of the survey data as a basis for gaining insight on secondary meaning;

- And despite all this, highly suggestive results regarding the secondary meaning of Plaintiff's brand from the subset of respondents residing in Southern California, and from respondents whose geographic focus encompassed any facility bearing the name Lakeside, implying that a properly controlled experimental survey of relevant consumers who were asked clear questions might well have supported an entirely different conclusion."

(*Id.* ¶ 5.)

Dr. McDonald was deposed on September 18, 2023. (Doc. 50-5 (Ex. 21) Deposition of Dr. Susan McDonald ("McDonald Dep.") at 1.) Regarding Dr. Chon's survey, Dr. McDonald stated, "in the context of a survey design so flawed and so likely to suppress secondary meaning, 11 percent [for Southern California residents] has to be taken as a very serious number within." (*Id.* at 20:7–10.)

**J. Plaintiff's Expert Dr. Juliano Laran**

Dr. Juliano Laran is a Behavioral Science Consultant and Marketing Professor at University of Basel. (Doc. 50-5 (Ex. 19) ("Laran Report") ¶ 1.) Dr. Laran was asked "to design and conduct a likelihood of confusion survey to determine whether relevant consumers who encounter the mark Detox Center of San Diego would likely believe that it is (a) the same company as San Diego Detox or (b) affiliated with San Diego Detox." (*Id.* ¶ 5.) The 201 respondents were United States adults who have considered a rehab or detox facility for themselves, anyone in their family, or a close friend in the last two years or are likely to consider the same in the next two years. (*Id.* ¶¶ 10, 11.) The respondents also either lived in Southern California or indicated they would consider Southern California as a possible destination for a rehab facility; 102 respondents lived in Southern California. (*Id.*) "Dr. Laran's survey include[d] five prompts for survey takers. In the test group, stimuli of Plaintiff's Mark and Defendants' Mark include[d] the term 'detox' and

18

the other three marks include the term 'recovery' and not the term 'detox.'  In the control group, stimuli of Plaintiff's Mark and the control (Detox Center of Southern California) include[d] the term 'detox,' and the other three stimuli are the same as the test group, with all three marks including the term 'recovery' and not the term 'detox.'"  (SODUF at 33.)  Dr. Laran applied the "Squirt" method, which "involves showing [respondents] both parties' use of their marks, and asking a series of questions to investigate whether respondents believe the marks come from the same or affiliated companies." (Laran Report ¶ 25.)  Dr. Laran concluded that relevant consumers are likely to confuse the San Diego Detox and Detox Center of San Diego marks.  (*Id.* ¶ 8.)  The net confusion rate amongst respondents was 14.4 percent.  (*Id.*)  Amongst respondents who live in Southern California, the net confusion rate was 18.8 percent.  (*Id.*)  Compared to the competitors included in the survey, the net confusion rate amongst respondents was 32.4 percent.  (*Id.* ¶ 9.)

## II.    LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010).  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Fortune Dynamic*, 618 F.3d at 1031 (internal quotation marks and citations omitted).  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex*, 477 U.S. at 323.  To carry its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have

19

enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Jones v. Williams*, 791 F.3d 1023, 1030–31 (9th Cir. 2015) (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000)).

Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Serv.*, 809 F.2d at 630 (citations omitted). The nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citation omitted).

When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255. In ruling on a motion for summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.   DISCUSSION

The Court will first address certain of the parties' evidentiary objections to the extent necessary to resolving their cross-motions for summary judgment. Then, the Court will move on to the merits of their cross-motions for summary judgment and Plaintiff's request for a preliminary or permanent injunction.

### A. Relevant Evidentiary Objections

#### 1. Timeliness of Defendants' Evidentiary Objections

On October 23, 2023, Defendants filed evidentiary objections to some of Plaintiff's evidence submitted in support of Plaintiff's MSJ. (Doc. 66.) On October 29, 2023, Plaintiff filed a response to Defendants' objections, arguing in part that they are untimely as they should have been filed with Defendants' Opposition to Plaintiff's MSJ due on

October 16, 2023.  (Doc. 67 at 2.)  Plaintiff's MSJ was noticed for a hearing date of October 30, 2023.  (Doc. 50 at 1.)

The Court concludes that Defendants' evidentiary objections to the materials attached to Plaintiff's MSJ (Doc. 50) are untimely and will not be considered.  *See Nguyen v. Marketsource, Inc.*, Case No. 17-cv-02063-AJB-JLB, 2018 WL 2182633, at *3–4 (S.D. Cal. May 11, 2018) (declining to consider late-filed evidentiary objections and collecting cases); S.D. Cal. Civ. LR 7.1(e)(2) ("Except as otherwise specified in Civil Local Rule 7.1.e.1, each party opposing a motion, application, or order to show cause must file that opposition or statement of non-opposition with the Clerk and serve the movant or the movant's attorney not later than fourteen (14) calendar days prior to the noticed hearing."). However, due to Plaintiff's attaching certain of its exhibits for its MSJ to its Opposition to Defendants' MSJ (Docs. 53 ("Notice of Errata Re Declarations"), 55), the Court concludes Defendants' evidentiary objections to those materials are timely and will be considered to the extent necessary to resolve these cross motions for summary judgment.

### 2. Plaintiff's Employees' Declarations

Defendants argue and object that Plaintiff's employees' declarations are self-serving hearsay that is unreliable and does not create a genuine issue of material fact.  (Doc. 49-1 at 19; Doc. 54 at 6.)  Plaintiff responds that Defendants' bias and credibility challenges fail at the summary judgment stage and due to Plaintiff's employees' declarations' detailing specific instances of actual confusion and evidence of widespread third-party brand recognition.  (Doc. 55 at 22–25.)

In *Nigro v. Sears, Roebuck & Co.*, the Ninth Circuit explained that a party's declarations are often self-serving, and "[a]lthough the source of the evidence may have some bearing on its credibility and on the weight it may be given by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature."  784 F.3d 495, 497 (9th Cir. 2015) (citations omitted). The Ninth Circuit also explained a self-serving declaration "does not always create a genuine issue of material fact for summary judgment: The district court can disregard a

self-serving declaration that states only conclusions and not facts that would be admissible evidence." *Id.* (citations omitted); *c.f. Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ("However, this court has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony.") (citations omitted).

In *Lahoti v. Vericheck, Inc.*, two witnesses testified on behalf of the defendant concerning a substantial number of calls they received from confused customers about not being able to find information on defendant Vericheck Inc. on the plaintiff's www.vericheck.com domain page. 636 F.3d 501, 509 (9th Cir. 2011). The plaintiff argued the district court improperly considered this hearsay evidence, but the Ninth Circuit concluded the customers' statements that came in through the witnesses were permissible under the state of mind exception to the hearsay rule under Federal Rule of Evidence 803(3). *Id.*

Here, the Court will consider specific instances and statements of confusion discussed in Plaintiffs' employees' declarations as falling under the state of mind exception. However, the Court will not consider those employees conclusory claims concerning the amount of instances of confusion beyond those instances specifically discussed. *See Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 873–74 (9th Cir. 2002) (finding the plaintiff's president's declaration's claim of receiving many letters of actual confusion, with only two of the letters attached, lacking foundation as to the statement he received "many" letters and "several calls" and that the two letters were not enough for actual confusion); *Filipino Yellow Pages, Inc. v. Asian J. Publications, Inc.*, 198 F.3d 1143, 1151–52 (9th Cir. 1999) (finding district court did not err in finding the plaintiff's president's declaration claiming confused customers contacted him without identifying "any of the supposedly confused consumers who contacted him" lacked foundation and noting declarations from a plaintiff's employees are of little probative value

given concerns regarding impartiality).[16]    Thus, Defendants' objections are **OVERRULED**.[17]

### 3. Thomas Hathorn's Deposition Testimony Concerning Descriptiveness

During Hathorn's deposition, he was asked if he believes the name San Diego Detox is descriptive and believed it was because he provides detox services in San Diego. (Doc. 49-14 (Ex. 12) Hathorn Dep. 47:17–48:2.)   Plaintiff's counsel objected during the deposition that such testimony calls for a legal conclusion and objected that such testimony is irrelevant, speculative, lacking foundation, and calls for an improper legal opinion/conclusion. (Doc. 56 at 4.)   To the extent Hathorn's testimony embraces a legal conclusion, the Court will disregard it, but will not disregard his testimony that he finds San Diego Detox describes his location and services. *See Persian Gulf Inc. v. BP W. Coast Prod. LLC*, 632 F. Supp. 3d 1108, 1131 (S.D. Cal. 2022) (on summary judgment, explaining such objections are unnecessary as the court will disregard improper legal conclusions and consider admissible factual evidence even if contained in the same paragraph).  Thus, Plaintiff's objection is **OVERRULED**.

///

---

[16] To the extent there is any evidence concerning Plaintiff's employees' personal recognition of Plaintiff's brand, such evidence is not probative, and the Court will disregard such statements.  *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995) ("'Attestations from person in close association and intimate contact with (the trademark claimant's) business do not reflect the views of the purchasing public.'") (quoting *Norm Thompson Outfitters, Inc. v. General Motors Corp.*, 448 F.2d 1293, 1297 (9th Cir. 1971)).

[17] To the extent Defendants challenge statements in these declarations as not properly authenticated (Doc. 66), those objections are overruled at this stage.  *See Romero v. Nevada Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016) ("Although Rule 56 was amended in 2010 to eliminate the unequivocal requirement that evidence submitted at summary judgment must be authenticated, the amended Rule still requires that such evidence would be admissible in evidence at trial.") (internal quotation marks and citations omitted).  To the extent there are concerns regarding discovery violations (Doc. 66), Defendants may raise those concerns with Magistrate Judge Leshner.

### 4.  Dr. Chorn's secondary meaning survey

Plaintiff objects to Dr. Chorn's secondary meaning survey as irrelevant, unreliable, and improper expert opinion under Federal Rules of Evidence 702 and 703.  (Doc. 56 at 5–6 (citing McDonald Report).)  Dr. McDonald identified at least four alleged deficiencies with Dr. Chorn's survey, as explained more detail *supra* at I.J.  To summarize, those deficiencies include (1) an improperly defined and incorrectly sampled survey universe, (2) an inapt and noisy control word mark (Lakeside), (3) an inherently ambiguous secondary meaning question, and (4) failure to fully and correctly analyze verbatim responses.  *See supra* at I.J.

These criticisms do not warrant the exclusion of Dr. Chorn's secondary meaning survey.  *See Fortune Dynamic, Inc.*, 618 F.3d at 1036 ("[W]e have made clear that 'technical inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.'") (quoting *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988)); *see also Vans, Inc. v. Walmart, Inc.*, Case No. SA CV 21-01876-DOC-KESx, 2023 WL 6927344, at *3 (C.D. Cal. Oct. 11, 2023) (explaining improper control goes to weight, not admissibility, of survey evidence) (citing *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1135 (C.D. Cal. 1998)); *Simpson Strong-Tie Co. Inc. v. MiTek Inc.*, Case No. 20-cv-06957-VKD, 2023 WL 137478, at *3 (N.D. Cal. Jan. 9, 2023) ("Even if a survey does not select the optimal universe, the results are often still probative of the proposition the survey was intended to test.") (citing *Vision Sports, Inc.*, 888 F.2d at 615); *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, Case No. 16-cv-3059-BAS-AGS, 2019 WL 5328730, at *4 (S.D. Cal. Oct. 21, 2019) ("The bulk of cases hold that an objection regarding the phrasing of survey questions and the use of potentially ambiguous terms is one that falls into the category of 'survey design.' The Ninth Circuit has specifically found that this issue goes to the weight of the survey, not the admissibility."); *Icon Enterprises Int'l, Inc. v. Am. Prod. Co.*, No. CV 04-1240 SVW (PLAx), 2004 WL 5644805, at *26 (C.D. Cal. Oct. 7, 2004) ("[C]ourts within the Ninth Circuit are reluctant to exclude survey evidence on the basis of an overinclusive or

1    underinclusive target population.").  Thus, Plaintiff's objections are **<u>OVERRULED</u>**.

2    **B. Cross-Motions for Summary Judgment**

3         The Court will now discuss whether Plaintiff's word and stylized marks are valid,

4    protectable trademarks and whether Defendants' use of their marks are likely to cause

5    confusion with Plaintiff's marks.

6         **1.  Trademark Infringement/Unfair Competition (First Cause of Action)[18]**

7         "To prevail on its trademark infringement claim, [Plaintiff] must show that: (1) it

8    has a valid, protectable trademark, and (2) that [Defendant's] use of the mark is likely to

9    cause confusion."  *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 969 (9th Cir.

10   2007) (citing *Brookfield Commcns, Inc.*, 174 F.3d at 1047, 1053).  "Registration of a mark

11   is prima facie evidence of the validity of the mark, the registrant's ownership of the mark,

12   and the registrant's exclusive right to use the mark in connection with the goods specified

13   in the registration."  *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014)

14   (citing 15 U.S.C. § 1115(a)).  "However, when a mark is not registered, the presumption

15   of validity does not apply; therefore, the plaintiff is left with the task of satisfying its burden

16   of proof of establishing a valid mark absent application of the presumption."  *Yellow Cab*

17   *Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005).

18

19   _____

20   [18] In Plaintiff's Opposition to Defendants' MSJ, Plaintiff argues it states a Lanham Act
21   unfair competition claim, which does not require proving mark validity.  (Doc. 55 at 19.)
     Plaintiff is incorrect as the standard for both a Lanham Act unfair competition claim and a
22   trademark infringement claim are the same.  *See Brookfield Commc'ns, Inc. v. W. Coast*
     *Ent. Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999) ("To establish a trademark infringement
23   claim under section 32 of the Lanham Act or an unfair competition claim under section
     43(a) of the Lanham Act, Brookfield must establish that West Coast is using a mark
24   confusingly similar to a valid, protectable trademark of Brookfield's."); *see also EVO*
25   *Brands, LLC v. Al Khalifa Grp. LLC*, 657 F. Supp. 3d 1312, 1324 (C.D. Cal. 2023) ("To
     establish a trademark infringement claim or an unfair competition claim under the Lanham
26   Act, a plaintiff must show that (1) the plaintiff has a protectable ownership interest in the
27   mark, and (2) that the defendant's use of the mark is likely to cause consumer confusion.")
     (citations omitted).

28

Here, Plaintiff's word and stylized marks are unregistered.  Thus, the burden rests on Plaintiff to prove it has valid, protectable word and stylized marks.

### i.  Valid, Protectable Trademark[19]

In Defendants' MSJ, they argue Plaintiff has failed to prove it owns a protectable trademark because Plaintiff's marks are not registered with the USPTO, are generic, or are descriptive and did not acquire secondary meaning before Defendants began using their marks.  (Doc. 49-1 at 14–25.)

"There are five categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful."  *Yellow Cab Co. of Sacramento*, 419 F.3d at 927 (citing *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005)).  "The latter three categories are deemed inherently distinctive and are automatically entitled to protection because they naturally 'serve[ ] to identify a particular source of a product....'"  *Id.* (citation omitted).  The distinction between the first two categories "carries significant consequences: descriptive marks are entitled to protection if the mark has acquired a secondary meaning, whereas generic marks are not entitled to any protection, regardless of secondary meaning or consumer confusion."  *Closed Loop Mktg., Inc. v. Closed Loop Mktg., LLC*, 589 F. Supp. 2d 1211, 1218 (E.D. Cal. 2008).  The Ninth Circuit has "noted in the past that 'the lines of demarcation [between the [five] categories of marks] are not always clear' and that 'courts often have difficulty in distinguishing between generic and

---

[19] Plaintiff argues its FBN gives it exclusive rights to the name San Diego Detox as a property right as well as any similar trade names.  (Doc. 50 at 22–23 (citing Cal. Business & Professional Code §§ 14411, 14416).)  Defendants respond that an FBN registration cannot interfere with the rights granted or reserved under federal law.  (Doc. 54 at 7 (citing Cal. Business & Professional Code § 14418).)  California Business & Professional Code § 14418 provides that the "filing of any fictitious business name statement pursuant to Section 17910 does not, of itself, authorize the use in this state of a fictitious business name in violation of the rights of another as established under this chapter, the federal law relating to trademarks (15 U.S.C. Sec. 1051 et seq.), or the common law, including rights in a trade name."  Thus, the Court determines Plaintiff's argument of exclusive use of its marks deriving from its FBN turns on the Court's resolution of Plaintiff's federal and state claims.

descriptive terms.'" *Filipino Yellow Pages*, 198 F.3d at 1151 n.5 (quoting *Surgicenters of Am., Inc. v. Medical Dental Surgeries Co.*, 601 F.2d 1011, 1015 (9th Cir. 1979)). "The difference between a generic mark and the weakest of descriptive marks may be almost imperceptible." *Id.*

The Court will now consider the threshold question of the impact of the USPTO's denial of Plaintiff's mark applications on the Court's analysis. Then, the Court will proceed to a discussion of whether Plaintiff's word and stylized marks are generic, suggestive, or descriptive, and if descriptive, whether Plaintiff's word and stylized marks have acquired secondary meaning.

### a)  USPTO Denials

The parties dispute whether this Court can consider the USPTO's denial of Plaintiff's word and stylized mark applications in determining whether Plaintiff has protectable marks. (Doc. 49-1 at 15; Doc. 55 at 8; Doc. 56 at 2.) The Court determines the USPTO determinations may serve as persuasive authority that a mark is not protectable. *See Closed Loop Mktg., Inc.*, 589 F. Supp. 2d at 1217–18 (finding USPTO's evaluation may serve as persuasive authority indicating a mark is not protectable); *see also Farm & Trade, Inc. v. Farmtrade, LLC*, No. 2:14-cv-00415-MCE, 2014 WL 1665146, at *5 (E.D. Cal. Apr. 23, 2014) (same). Thus, Plaintiff's objection is **OVERRULED**.

In refusing to register Plaintiff's word mark, the USPTO explained San Diego is "primarily geographically descriptive of the origin of applicant's goods and/or services" and Detox "is highly descriptive or generic as applied to the applicant's services." (Doc. 49-3 (Ex. 1) at 2–3.) The USPTO advised Plaintiff that if it sought to amend its principal registry application to seek Trademark Act Section 2(f) acquired distinctiveness, it must disclaim the word Detox because it "appears to be generic in the context of applicant's goods and/or services." (*Id.* at 3.) In refusing to register Plaintiff's stylized mark, the USPTO advised Plaintiff it must disclaim San Diego as it is primarily geographically descriptive and must disclaim Detox as its "merely descriptive of an ingredient, quality, characteristic, function, feature, purpose, or use of applicant's goods and/or services."

(Doc. 49-4 (Ex. 2) at 2.)  In response, Plaintiff disclaimed San Diego "as the origin of [Plaintiff's services]," but submitted that Detox was not merely descriptive given the numerous definitions of Detox.  (Doc. 49-5 (Ex. 3) at 1–32; Doc. 49-6 (Ex. 4) at 1–32.)

While the Court considers the USPTO's denials as persuasive authority, it does not appear the USPTO considered the San Diego Detox mark as a composite term.  "[U]nder the anti-dissection rule, the validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993) (citing *California Cooler, Inc. v. Loretto Winery Ltd.*, 774 F.2d 1451, 1455 (9th Cir. 1985).  Plaintiff's word and stylized marks are composite marks, thus, the anti-dissection rule applies.  *See id.* Accordingly, the Court must consider whether the entire composite mark San Diego Detox is generic, suggestive, or descriptive with acquired secondary meaning.

### b) Generic

Defendants argue that Plaintiff's marks are generic because they are comprised of two generic terms, San Diego, a location in California, and Detox, a "a program or facility for assisting a person undergoing detoxification from an intoxicating or addictive substance." (Doc. 49-1 at 16 (citing 49-3 (Ex. 1) at 6–7) (dictionary definitions attached to USPTO trademark denial).)  Plaintiff responds that (1) the USPTO's denial is not relevant or probative of the mark's strength and the USPTO refusal did not include an advisory statement that the mark appears generic, (2) the mark is a composite mark even if made up of generic or descriptive terms, and (3) no one used Plaintiff's composite mark prior to Plaintiff and only a handful other than Defendants have done so after Plaintiff invested in building its brand.  (Doc. 55 at 18–19.)  Defendants reply that San Diego is generic in describing all businesses in San Diego County and Detox is generic in referring to a class of services provided by Plaintiff.  (Doc. 65 at 4–5, 7.)

"Generic marks give the general name of the product; they embrace an entire class of products." *Yellow Cab Co. of Sacramento*, 419 F.3d at 927 (citing *Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998)).  "Generic

marks are not capable of receiving protection because they identify the product, rather than the product's source." *Id.* (citing *KP Permanent Make–Up*, 408 F.3d at 602).  "Generic marks lack any distinctive quality, and therefore are not entitled to trademark protection." *Id.* at 928 (citing *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 943 n.6 (9th Cir. 2002)).  "Whether a mark is generic is a question of fact." *Yellow Cab Co. of Sacramento*, 419 F.3d at 929 (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 840 (9th Cir. 2001)).

"To determine whether a term has become generic, we look to whether consumers understand the word to refer only to a particular producer's goods or whether the consumer understands the word to refer to the goods themselves." *Id.* (citing *KP Permanent Make–Up, Inc.*, 408 F.3d at 604).  "In determining whether a term is generic, we have often relied upon the 'who-are-you/what-are-you' test: 'A mark answers the buyer's questions 'Who are you?' 'Where do you come from?' 'Who vouches for you?' But the [generic] name of the product answers the question 'What are you?'" *Filipino Yellow Pages, Inc.*, 198 F.3d at 1147 (quoting *Official Airline Guides, Inc.*, 6 F.3d at 1391).  "Under this test, '[i]f the primary significance of the trademark is to describe the type of *product* rather than the *producer*, the trademark [is] a generic term and [cannot be] a valid trademark." *Id.* (quoting *Anti–Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 304 (9th Cir. 1979)) (emphasis in original).

"When a plaintiff pursues a trademark action involving a properly registered mark, that mark is presumed valid, and the burden of proving that the mark is generic rests upon the defendant." *Yellow Cab Co. of Sacramento*, 419 F.3d at 928 (citing *Filipino Yellow Pages, Inc.*, 198 F.3d at 1146).  "However, if the disputed term has not been federally registered, and the defendant asserts genericness as a defense, the burden shifts to the plaintiff to show that the mark is nongeneric." *Id.*  The crucial date for the determination of genericness is the date on which the alleged infringer entered the market with the disputed mark or term.  *Id.* (citing *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 744 (2d Cir. 1998)).

### 1. Case Law

In *Filipino Yellow Pages*, the plaintiff published a directory called "Filipino Yellow Pages" in 1990 and competed in the Filipino American telephone directory market in California. 198 F.3d at 1144. In June 1996, the plaintiff sought to register the "Filipino Yellow Pages" mark with the USPTO, but the USPTO denied the application because "[t]he proposed mark merely describes the goods and the nature and intended audience for the goods." *Id.* at 1145. The USPTO advised the plaintiff that, due to the plaintiff's use of the mark for a significant time, it could amend its application to seek registration based on acquired distinctiveness. *Id.* The USPTO also required any amended application to disclaim exclusive right to use the term "yellow pages." *Id.* The district court granted summary judgment to defendant, holding that "Filipino Yellow Pages" is generic, or alternatively, descriptive and Plaintiff failed to produce admissible evidence of secondary meaning. *Id.* On appeal, the Ninth Circuit explained that the terms "Filipino" and "yellow pages" are generic, but that the question was whether the composite term "Filipino Yellow Pages" was generic or descriptive. *Id.* at 1147–48. The Ninth Circuit affirmed, finding the district court appropriately relied on not only the dictionary definitions of "Filipino" and "yellow pages," but also other evidence, including (1) plaintiff's owner's use of the term "Filipino Yellow Pages" in a generic sense in a shareholder buyout agreement, (2) the plaintiff did not sue a second "Filipino Yellow Pages" marketing to the Filipino American community on the East Coast, and (3) an article discussing a trend toward specialized yellow pages and referring to a directory as "Filipino yellow pages" instead of its actual title. *Id.* at 1150–51. The Ninth Circuit also explained that, because the plaintiff bore the burden to prove the mark was not generic as its mark was not registered, the plaintiff failed to offer evidence of non-genericness sufficient to rebut the fairly modest evidence of genericness the defendant offered. *Id.* at 1151. Based on this evidence, the Ninth Circuit determined that, faced with the question "What are you?," all of the directories could respond "A Filipino yellow pages." *Id.*

In *Yellow Cab Company of Sacramento*, the plaintiff Yellow Cab Company of

30

Sacramento, a taxicab company operating since 1922, sued defendant Yellow Cab of Elk Grove, which began operating in 2001, for, *inter alia*, trademark infringement.  419 F.3d at 926–27.  The district court granted defendant's motion for summary judgment, finding "yellow cab" is a generic term, or alternatively, descriptive and plaintiff failed to establish secondary meaning.  *Id.* at 927.  The Ninth Circuit reversed, finding a genuine dispute of material fact as to whether the term "yellow cab" was generic.  *Id.* at 929–30.  Specifically, the Ninth Circuit reasoned that if a cab company was asked "What are you?," the expected response would be a taxicab company or cab company.  *Id.* at 929.  And if a cab company was asked to refer someone to a yellow cab company, they would point not to themselves, but a business operating under the name "Yellow Cab."  *Id.*  The Ninth Circuit explained the plaintiff came forward with evidence demonstrating the existence of a genuine dispute of material fact as to whether the term "Yellow Cab" was generic.  *Id.* at 929–30.

### 2.   Analysis

Here, because Plaintiff's mark is unregistered, Plaintiff bears the burden to prove San Diego Detox is not a generic mark.  *See Yellow Cab Co. of Sacramento*, 419 F.3d at 928.  Plaintiff has not met its burden.  Even more modest than the evidence presented in *Filipino Yellow Pages*, Defendants present evidence of the separate dictionary definitions of San Diego and Detox, arguing each term is generic.  (*See* Doc. 49-3 (Ex. 1) at 6–7.)  Yet it is Plaintiff, not Defendants, who bears the burden to show nongenericness of its unregistered marks.  Plaintiff argues Defendants do not address whether the composite mark San Diego Detox is generic and points to the fact that the USPTO did not deny the trademark applications on the basis that the mark as a whole appears generic.  (*See* Doc. 55 at 18–19).[20]  But Plaintiff fails to proffer evidence that its marks are not generic.

The central question in assessing genericness is "whether consumers understand the

---

[20] The Court separately notes the secondary meaning and likelihood of confusion surveys in this case do not appear to probe the distinction between customers' perception of a particular producer's goods or the goods themselves.  (*See* Chorn Report; Laran Report.)

31

word to refer only to a particular producer's goods or whether the consumer understands the word to refer to the goods themselves." *Yellow Cab Co. of Sacramento*, 419 F.3d at 928 (citing *KP Permanent Make-Up, Inc.*, 408 F.3d at 604). While each of the terms San Diego and Detox may be generic or highly descriptive, as a composite term, one may expect that San Diego Detox answers the "Who are you?" question, not the "What are you?" question. *See Filipino Yellow Pages, Inc.*, 198 F.3d at 1147. For example, if one were to ask an employee of a detox facility in San Diego "What are you?," one would expect the answer to be a detox facility or more specifically a detox facility in San Diego. On the other hand, if an employee of a detox facility were asked to refer someone to San Diego Detox, they may point not to themselves, but a business operating under the name San Diego Detox.

Despite this reasoning, genericness is a question of fact, and the Court is not persuaded that Plaintiff has presented sufficient evidence to meet its burden to prove that San Diego Detox is nongeneric to entitle Plaintiff to summary judgment. *See Yellow Cab Co. of Sacramento*, 419 F.3d at 927, 929–30. Thus, the Court concludes there is a genuine dispute of material fact as to whether the composite term San Diego Detox is generic that a jury must resolve.

### c) **Suggestive**

Plaintiff argues its marks are suggestive because (1) the USPTO's denial for the stylized mark was not for Section 2(e)(1) mere descriptiveness; (2) the composite mark is not primarily geographically descriptive as a whole; (3) the composite mark is "alliterative, has symmetric second and third words, a 6-syllable cadence, beachy imagery and colors, making it distinctive;" (4) Defendants admit no one previously used San Diego and Detox in a name; and (5) there are multiple meanings for the word Detox, requiring a mental leap for the composite mark. (Doc. 50 at 23–25 (citing *Moroccanoil*, 590 F. Supp. 2d at 1277); Doc. 55 at 15–16 (citing Doc. 50-4 (Ex. 2)).) Defendants respond that (1) Plaintiff admits San Diego is geographically descriptive in deposition testimony, on its website, and in its disclaimer in its pending revised USPTO application; and (2) Plaintiff admits the term

Detox is descriptive of its services in deposition testimony and on its website. (Doc. 54 at 3–4 (citing Doc. 49-4 (Ex. 2) at 2; Doc. 49-5 (Ex. 3) at 1; Doc. 49-11 (Ex. 9) at 1; Doc. 49-14 (Ex. 12) Hathorn Dep. 46:21–48:2, 48:13–22).)   Plaintiff replies that Defendants themselves argue Plaintiff's stylized mark is distinctive even amongst beachy themes. (Doc. 62 at 3.)

In response to Defendants' MSJ, Plaintiff further argues (1) Defendant cites four to five recent examples of opportunistic poachers of Plaintiff's marks; (2) Dr. Laran's survey finding of high likely confusion confirm the composite mark is distinctive; (3) the *Self-Realization Fellowship Church* and *Moraccanoil* cases control, not *Japan Telecom*, because Detox has many potential meanings; and (4) Plaintiff's CEO Hathorn made no disputed factual admission of descriptiveness that is not an improper legal conclusion. (Doc. 55 at 16–18.)   Defendants reply that Plaintiff ignores the USPTO's denial required disclaimer of the words "San Diego Detox" except as used in the stylized mark because it is descriptive. (Doc. 65 at 2.)[21]

"Unlike descriptive marks, which 'define qualities or characteristics of a product in a straightforward way,' suggestive marks convey impressions of goods that require the consumer to 'use imagination or any type of multistage reasoning to understand the mark's significance.'" *Pom Wonderful LLC*, 775 F.3d at 1126 (citing *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141–42 (9th Cir. 2002)).  In determining suggestiveness, "[courts] look at 'the imaginativeness involved in the suggestion, that is, how immediate and direct is the thought process from the mark to the particular product.  If the mental leap between the word and the product's attribute is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness.'" *Japan Telecom, Inc.*, 287 F.3d at 873 (quoting *Self–Realization Fellowship Church*, 59 F.3d at 911).  "Importantly, the line between

---

[21] The Court need not reach Defendants' arguments concerning Section 2(f) acquired distinctiveness or supplemental registration as Plaintiff has not attempted either of those registrations. (*See* Doc. 65 at 2–3.)

descriptive and suggestive marks is elusive, and '[w]hich category a mark belongs in is a question of fact.'" *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1162 (9th Cir. 2021) (citing *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010)).

## 1.   Case Law

In *Japan Telecom, Inc.*, the plaintiff Japan Telecom sold and installed telephone and computer networking equipment in the Los Angeles area for 14 years until defendant Japan Telecom America, the third-largest telecommunications company in Japan, entered the market. 287 F.3d at 870. The plaintiff sued the defendant alleging federal and state trademark infringement and unfair competition for its mark "Japan Telecom." *Id.* The district court granted the defendant's motion for summary judgment on all claims. *Id.* On appeal, the Ninth Circuit affirmed and, in part, determined that "Japan Telecom" was descriptive, not suggestive, because its trade name "leaves very little to the imagination. Japan Telecom is in the telecommunications business, and its name says so. Consumers who are familiar with the convention of using 'Japan' to refer to a business that caters to the Japanese community will immediately understand Japan Telecom's niche. Consumers who don't will still not need to make any mental leap between Japan Telecom's name and what it does." *Id.* at 873.

In *Moroccanoil, Inc.*, since 2007, the plaintiff distributed a hair care product containing argan oil from Morocco to salons in the United States; the product bore the mark MOROCCANOIL. 590 F. Supp. 2d at 1275. In 2008, the plaintiff applied for and received a trademark for Moroccanoil hair products. *Id.* Since March 2008, the defendants marketed and sold a hair care product called "Moroccan Miracle Oil Hair Treatment" made of argan oil from Morocco with labels "Moroccan Gold" and "Moroccan Miracle Oil" on the products. *Id.* The defendants applied for a federal registration of "Moroccan Oil" in 2008; the USPTO denied the application in light of the plaintiff's pending application and the USPTO denied a subsequent "Moroccan Gold" mark due to possible likelihood of confusion with Plaintiff's pending marks. *Id.* The plaintiff sued defendants for numerous

34

claims including trademark infringement and sought a preliminary injunction. *Id.* The district court concluded the plaintiff presented sufficient evidence that it was likely to succeed in establishing the mark is suggestive, not descriptive, including evidence MOROCCANOIL does not convey an immediate idea of a line of hair care products containing argan oil and many possible categories of oil originate from Morocco. *See id.* at 1277.[22]

### 2.   Analysis

Here, the USPTO denied Plaintiff's word and stylized mark applications in part because it determined that San Diego was primarily geographically descriptive, and Detox was highly descriptive or generic as applied to Plaintiff's services or "merely descriptive of an ingredient, quality, characteristic, function, feature, purpose, or use of applicant's goods and/or services." (Doc. 49-3 (Ex. 1) at 2–3; Doc. 49-4 (Ex. 2) at 2.)  In doing so, the USPTO relied in part on the Merriam-Webster definition of Detox as meaning detoxification from intoxicating or addictive substance and therefore being merely descriptive of Plaintiff's services. (Doc. 49-3 (Ex. 1) at 3, 6.)  *See Fortune Dynamic, Inc.*, 618 F.3d at 1033–34 (explaining a suitable place to begin the analysis between a suggestive and descriptive mark is the dictionary).  In response to the USPTO's denials, Plaintiff disclaimed San Diego as the origin of Plaintiff's services, but argued that Detox is not merely descriptive of Plaintiff's services. (Doc. 49-6 (Ex. 4) at 1–32; Doc. 49-5 (Ex. 3) at 1–32.)  Plaintiff pointed to numerous registered trademarks containing the word Detox covering areas including wellness, nutrition, education, financial literacy, reseller services, drinking water, medical services, consumer protection information, computer software, beverages, soups, pharmaceuticals, cleaning, skin care, social media awareness, dietary supplements, hair care, food and drink catering, etc. (*Id.*)

---

[22] The district court drew this conclusion in the context of assessing the strength of the plaintiff's mark for the likelihood of confusion prong. *See id.*

The Court concludes that, while San Diego may be primarily geographically descriptive, Plaintiff has raised a genuine dispute of material fact as to whether the composite word and stylized marks San Diego Detox are suggestive.  In particular, Plaintiff has pointed to evidence that the word Detox may require an imaginative leap for customers to determine that Plaintiff provides alcohol and substance abuse detoxification services. *See Moroccanoil, Inc.*, 590 F. Supp. 2d at 1277.  A jury should resolve the question of whether San Diego Detox is merely descriptive as a whole of the location and type of services Plaintiff offers, or whether San Diego Detox requires a non-instantaneous mental leap to determine the services Plaintiff provides and is therefore suggestive.

### d)  Descriptive

Defendants argue that the terms San Diego and Detox are "descriptive of specific attributes of the Plaintiff's location and detox services," Plaintiff's CEO Hathorn admits the mark is descriptive, and Hathorn had serious doubt as to whether potential clients associate San Diego Detox with his business.  (Doc. 49-1 at 17 (citing Doc. 49-14 (Ex. 12) Hathorn Dep. 47:17–48:2, 90:9–19, 91:1–92:5).)

"Descriptive marks 'define a particular characteristic of the product in a way that does not require any exercise of the imagination.'" *Yellow Cab Co. of Sacramento*, 419 F.3d at 927 (citing *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 632 (9th Cir. 2005)).  "This requires showing that there is 'a mental recognition in buyers' and potential buyers' minds that products connected with the [mark] are associated with the same source.'"  *Japan Telecom, Inc.*, 287 F.3d at 873 (quoting *Self–Realization Fellowship Church*, 59 F.3d at 911).

For the reasons discussed *supra* at III.B.1.i.c, the Court determines there is a genuine dispute of material fact as to whether the composite term San Diego Detox is descriptive.  Thus, the Court now considers whether Plaintiff's marks acquired secondary meaning.

### e)  Secondary Meaning

#### 1.  Parties' Arguments

Defendants argue that Plaintiff's marks did not acquire secondary meaning by the

time Defendants served their first client because (1) Plaintiff filed this suit in August 2022 before taking its first client in September 2022, (2) Plaintiff promoted its marks for only seven months before Defendants served their first client in October 2022, and (3) Plaintiff relies heavily on connections with potential referral partners, not prospective consumers. (Doc. 49-1 at 17–18.)  Defendants argue Plaintiff has failed to produce sufficient evidence its marks have acquired secondary meaning, in that Plaintiff (1) cites no consumer testimony or even evidence from referral partners, but rather only self-serving hearsay declarations from Plaintiff's employees; (2) fails to conduct a survey concerning secondary meaning and Defendants' expert Dr. Chorn concluded the alleged mark does not have secondary meaning even one year after Plaintiff began paid internet advertising; (3) Google search results show Plaintiff is not the exclusive user of San Diego and Detox in connection with Plaintiff's services and Plaintiff could only legally provide services for a month before Defendants began offering services; (4) Plaintiff does not provide any evidence its advertising connected its marks with Plaintiff's services in the mind of the relevant consumer; (5) Plaintiff has not provided non-self-serving evidence to prove it has an established place in the market by virtue of its marks; and (6) Plaintiff has not offered admissible evidence of intentional copying.  (*Id.* at 19–24.)  Plaintiff replies that (1) there is no timing bar for secondary meaning; (2) secondary meaning is shown in any event; (3) Plaintiff's employees' declarations cannot be ignored; (4) the surveys in this case support secondary meaning; and (5) exclusivity, manner, length of use, and advertising support Plaintiff's position.  (Doc. 55 at 19–30.)

In Plaintiff's MSJ, it argues (1) actual confusion is strong evidence of secondary meaning and there has been 45 or more reported instances of confusion from customers, prospective customers, and referral partners, as well as a survey showing significant confusion; (2) Plaintiff's proof of advertising is sufficient to show secondary meaning; and (3) Defendants' own survey by Dr. Chorn shows one out of ten Southern Californians who have or will in the next 12 months consider or recommend drug treatment recognize San Diego Detox as a single source identifier.  (Doc. 50 at 25–27.)  Defendants respond that

1  Plaintiff has not presented direct evidence of secondary meaning or that at the very least

2  there is a genuine dispute of material fact on this issue.  (Doc. 54 at 4–5.)

### 2.    Relevant Law

4    "A descriptive mark can receive trademark protection if it has acquired

5  distinctiveness by establishing 'secondary meaning' in the marketplace." *Japan Telecom,*

6  *Inc.*, 287 F.3d at 873 (citing *Filipino Yellow Pages, Inc.*, 198 F.3d at 1147).  "To determine

7  whether a descriptive mark has secondary meaning, a finder of fact considers: '(1) whether

8  actual purchasers of the product bearing the claimed trademark associate the trademark

9  with the producer, (2) the degree and manner of advertising under the claimed trademark,

10  (3) the length and manner of use of the claimed trademark, and (4) whether use of the

11  claimed trademark has been exclusive.'"  *Yellow Cab Co. of Sacramento*, 419 F.3d at 930

12  (quoting *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985)).

13  Secondary meaning can also be established by consumer testimony, survey evidence,

14  amount of sales and number of customers, established place in the market, and proof of

15  intentional copying by the defendant.  *Filipino Yellow Pages, Inc.*, 198 F.3d at 1151.

16  "Secondary meaning can also be established by evidence of likelihood of confusion."

17  *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1015 (9th Cir. 1985)

18  (citing *Norm Thompson Outfitters, Inc. v. General Motors Corp.*, 448 F.2d 1293, 1297 (9th

19  Cir. 1971)).  "[T]he question of secondary meaning is one of fact."  *Yellow Cab Co. of*

20  *Sacramento*, 419 F.3d at 930 (citation omitted).

21    The plaintiff must prove its mark acquired secondary meaning by the time of the

22  defendant's alleged infringement.  *Levi Strauss & Co*., 778 F.2d at 1358 (citing *HMH*

23  *Publishing Co. v. Brinca*t, 504 F.2d 713, 715 (9th Cir. 1974)); *see also Opulent Treasures,*

24  *Inc. v. Ya Ya Creations, Inc.*, 682 F. Supp. 3d 815, 822 (C.D. Cal. 2023) (explaining

25  plaintiff must prove its trade dress acquired secondary meaning by the time of the

26  defendant's first act of infringement) (citing *Braun, Inc. v. Dynamics Corp. of Am.*, 975

27  F.2d 815, 826 (Fed. Cir. 1992); *Cont'l Lab'y Prod., Inc. v. Medax Int'l, Inc.*, 114 F. Supp.

28  2d 992, 999 (S.D. Cal. 2000) ("The plaintiff bears the burden of showing its mark or design

38

obtained secondary meaning before the defendant commenced its allegedly infringing activities.") (citations omitted).  However, "[s]urveys conducted within five years of the first infringing use are generally relevant, and the time (zero to five years) between the first infringing use and the survey goes to the weight of the survey evidence." *P & P Imports LLC v. Johnson Enterprises, LLC*, 46 F.4th 953, 963 (9th Cir. 2022) (citing *Converse, Inc. v. ITC*, 909 F.3d 1110, 1123 (Fed. Cir. 2018)).

### 3.   Analysis of Factors

*Consumer Testimony and Survey Evidence*.  Plaintiff does not present evidence in the form of consumer testimony to show consumers associate Plaintiff's services with its word or stylized marks.  However, Plaintiff has submitted a likelihood of confusion survey and Defendants have submitted a secondary meaning survey, both of which may bare on this question.  *See Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) ("An expert survey of purchasers can provide the most persuasive evidence of secondary meaning."); *see also Transgo, Inc.*, 768 F.2d at 1015 ("Secondary meaning can also be established by evidence of likelihood of confusion."); *Levi Strauss*, 632 F.2d at 821 ("Secondary meaning and likelihood of buyer confusion are separate but related determinations, the relationship rising from the same evidentiary findings.").

There is inconsistency in court decisions concerning the sufficient percentage of persons who identify a mark with its source to establish secondary meaning.  *See* § 32:190. Secondary meaning—Significant level of identification, 5 McCarthy on Trademarks and Unfair Competition § 32:190 (5th ed.) ("The courts have been confused and inconsistent as to the percentage of persons who use the designation to identify a source which is sufficient to constitute a 'significant' amount.").  Some courts have held survey results of 10 or 25 percent association with plaintiff's marks are insufficient to support proof of secondary meaning.  *Id.* (citing *Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670 (S.D.N.Y. 1963) and *Roselux Chemical Co. v. Parsons Ammonia Co.*, 299 F.2d 855 (C.C.P.A. 1962)); *see also Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992) (for secondary meaning, "[w]hile a 50–percent figure is regarded as clearly sufficient

39

to establish secondary meaning, a figure in the thirties can only be considered marginal."); *Warner Bros. Ent. v. Glob. Asylum, Inc.*, No. CV 12-9547 PSG (CWx), 2012 WL 6951315, at \*4 (C.D. Cal. Dec. 10, 2012) ("Other courts in this jurisdiction have found that consumer association of approximately 50 percent is sufficient to establish secondary meaning.").

On one hand, Plaintiff presents Dr. Laran's survey, which concluded relevant consumers are likely to confuse San Diego Detox and Detox Center of San Diego's marks. (Laran Report ¶ 8.)  Dr. Laran found a net confusion rate amongst respondents of 14.4 percent, which increased to 18.8 percent amongst Southern California residents, and a net confusion rate amongst control competitors of 32.4%.  (*Id.* ¶¶ 8–9.)  On the other hand, Defendants present Dr. Chorn's survey, which concluded that of consumers in the drug and alcohol detox or inpatient rehabilitation population, consumers do not associate the name San Diego Detox with a single source.  (Chorn Report ¶ 13.)  In particular, Dr. Chorn found essentially 0 net percent of respondents associate the name San Diego Detox with one company or brand, and the net associate rate rose to 1.5 percent amongst California residents and to 11.2 percent amongst Southern California residents.  (*Id.* n. 3.)  Thus, there is conflicting evidence on this point, raising a genuine dispute of material fact.

***Degree and Manner of Advertising***.  "In examining whether a plaintiff's advertising is enough to establish secondary meaning, we look at the advertising's 'amount, nature and geographical scope' with an eye towards how likely the advertising is to expose a large number of the relevant consuming public to the use of the symbol as a trademark or trade name." *Japan Telecom, Inc.* 287 F.3d at 875 (quoting *Am. Sci. Chem., Inc. v. Am. Hosp. Supply Corp.*, 690 F.2d 791, 793 (9th Cir. 1982)).  In other words, "the advertising must be of a 'nature and extent to create an association' with the advertiser's goods." *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009) (quoting *Dep't of Parks and Recreation v. Bazaar Del Mundo*, 448 F.3d 1118, 1128 (9th Cir. 2006)).  "The 'true test of secondary meaning' is the effectiveness of the advertising effort." *Id.* (quoting *International Jensen v. Metrosound U.S.A.*, 4 F.3d 819, 824 (9th Cir. 1993) ("While evidence of a manufacturer's sales, advertising and promotional activities may be relevant

40

in determining secondary meaning, the true test of secondary meaning is the effectiveness of this effort to create it.")).

Plaintiff presents evidence that it hired a marketing firm in 2022 that implemented marketing plans for 2022 and 2023 and that Plaintiff's former head of business development advertised Plaintiff's services to trusted contacts, members of the drug recovery community, referral partners, and EAPs from March 2022 through August 2022. (*See* Hathorn Decl. ¶ 4; (Kuzminsky Decl. 1 ¶¶ 8, 16; Kuzminsky Decl. 2 ¶¶ 5–6.)  There is also evidence that Plaintiff began Google AdWords advertising around July 2022, spent ███████████ on advertising during those first three months, and obtained ███ impressions from July 2022 to July 2023.  (*See* Doc. 52-11 (Ex. 25) Hathorn Dep. 55:22–25, 76:17–77:5, 77:21–24, 77:11–20, Doc. 52-10 (Ex 23).)  On the other hand, Hathorn conceded he did not believe Plaintiff had done sufficient advertising that a resident of San Diego, if asked about San Diego Detox, would know it refers to Plaintiff as opposed to other detoxification services in San Diego. (*See* Doc. 49-14 (Ex. 12) Hathorn Dep. 90:9–19.)  Hathorn also highly doubted whether Plaintiff had done sufficient advertising that someone would know San Diego Detox is a business.  (*See id.* 91:21–92:5.)  Similarly, Plaintiff's former head of business development, Kuzminsky, who advertised Plaintiff's services from March to August 2022, did not believe families of people needing detoxification services would know the business name San Diego Detox.  (*See* Doc. 49-15 (Ex. 13) Kuzminsky Dep. 59:14–60:5.)

While it appears Plaintiff advertised to the drug recovery community, including referral partners and EAPs, in a short period prior to Defendant's first alleged infringement in October 2022, it is unclear to the Court how much of Plaintiff's advertising during that period was toward the relevant consuming public.  And while there may have been a significant number of Google AdWords impressions from advertising between July 2022 and July 2023, it is unclear to the Court how successful that advertising was from July 2022 until Defendant's first alleged infringement in October 2022—the relevant time period.  Thus, the Court has insufficient information to determine the success of Plaintiff's

advertising efforts toward the relevant consuming public during the relevant time period.

*Length and Manner of Use and Exclusive Use*.  On the length and manner of use, Plaintiff presents evidence that it (1) registered the domain name SanDiegoDetox.com on December 14, 2020, (2) registered San Diego Detox, LLC with the California Secretary of State on June 9, 2021, and (3) obtained its license to operate in September 2022 and admitted its first patient that same month.  (Hathorn Decl. ¶ 2; SODUF at 9, 22.)

Plaintiff also argues that its non-sale activities in advertising its services prior to opening in September 2022 should be considered by the Court.  (Doc. 55 at 28–29 (citing *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151 (9th Cir. 2001).)  Defendants argue that Plaintiff only lawfully used its alleged marks in commerce beginning in September 2022, when they became licensed to operate, before Defendants' first alleged infringement in October 2022.  (Doc. 49-1 at 21–23.)

In *Chance*, the Ninth Circuit held that "the totality of the circumstances must be employed to determine whether a service mark has been adequately used in commerce so as to gain the protection of the Lanham Act."  242 F.3d at 1159.  The Ninth Circuit further explained the district court:

> should be guided in their consideration of non-sales activities by factors … such as the genuineness and commercial character of the activity, the determination of whether the mark was sufficiently public to identify or distinguish the marked service in an appropriate segment of the public mind as those of the holder of the mark, the scope of the non-sales activity relative to what would be a commercially reasonable attempt to market the service, the degree of ongoing activity of the holder to conduct the business using the mark, the amount of business transacted, and other similar factors which might distinguish whether a service has actually been 'rendered in commerce.'

*Id.*  Subsequently, in the context of a dispute concerning trademark use priority, in *CreAgri, Inc. v. USANA Health Scis., Inc.*, the Ninth Circuit held that "only *lawful* use in commerce can give rise to trademark priority."  474 F.3d 626, 630 (9th Cir. 2007).  While *CreAgri, Inc.* concerned priority of use of a trademark, the Court finds its analysis relevant to determining the length of lawful use in commerce of Plaintiff's alleged marks for the length

42

and manner of use prong for secondary meaning.  Accordingly, the Court will not consider Plaintiff's non-sale activities prior to September 2022 in assessing length of use since it would have been unlawful for Plaintiff to operate its facility prior to then.  (*See* SODUF at 9, 22; Doc. 49-14 (Ex. 12) Hathorn Dep. 52:13–18.)  The Court determines Plaintiff began its use in commerce when it became licensed to operate and accepted its first patient in September 2022.

Thus, Plaintiff's length of use of its marks runs from September 2022 until Defendants' alleged first infringement in October 2022.  "There is no talismanic number of months or years that establishes when an unregistered trademark or trade dress can obtain secondary meaning."  *Cont'l Lab'y Prod., Inc.*, 114 F. Supp. 2d at 1004. Additionally, "[a] plaintiff's exclusive use of a mark for a sufficient period may constitute sufficient evidence of secondary meaning to survive summary judgment."  *Herbal Chef, LLC v. AFG Distribution, Inc.*, Case No. 2:18-cv-8539-AB-MRW, 2020 WL 3064439, at *5 (C.D. Cal. Mar. 10, 2020) (citing *California Scents v. Surco Prod., Inc.*, 28 F. App'x 659, 663 (9th Cir. 2002) ("Five years of exclusive use is prima facie evidence of secondary meaning[.]")).  "Evidence of third party usage … is relevant to disprove the existence of secondary meaning."  *Levi Strauss & Co.*, 778 F.2d at 1358.

On exclusive use, Plaintiff points to some of Defendants' 30(b)(6) witnesses' testimony that they were not aware of any other San Diego company using the terms Detox and San Diego in their name besides the parties as of June 2023.  (*See* Doc. 50-4 (Ex. 9) 30(b)(6) Dep. 1 at 64:11–15; Doc. 50-4 (Ex. 10) 30(b)(6) Dep. 2 at 105:5–9.)  Defendants point to a September 25, 2023 Google search showing as many as five other third-party facilities describing their services using the terms San Diego and Detox.  (*See* SODUF at 22; Doc. 49-4 (Ex. 7).)  This evidence raises questions concerning whether Plaintiff was the exclusive user of the terms San Diego and Detox in name and promotional activities during the short period from its lawful use beginning in September 2022 to Defendant's alleged infringement in October 2022. *See Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1180 (N.D. Cal. 2007) ("Whether secondary meaning attaches after

43

a period of exclusive use depends on how, rather than how long, the plaintiff used its mark or design."); *c.f. Spark Indus., LLC v. Kretek Int'l, Inc.*, No. CV 14-5726-GW(ASx), 2014 WL 4365736, at *12 (C.D. Cal. Aug. 28, 2014) ("[A]s a general matter, two years of exclusive use is on the low end of the spectrum.").  But even if the Court determined that Plaintiff did engage in exclusive use during the relevant time period, the Court concludes Plaintiff's limited, legal length of use of its marks prior to Defendants' first alleged infringement counts against Plaintiff on secondary meaning.

  ***Amount of Sales***.  Plaintiff presents evidence that its gross profits were ▮▮▮▮▮▮▮▮ in an eight-month period, including approximately ▮▮▮▮▮▮ in gross profits in 2022. (Doc. 52-6 (Ex. 6) at 2–8.)  However, the Court cannot determine how much of Plaintiff's profits are from when Plaintiff began operating in September 2022 to Defendants' first infringement in October 2022.  *See Cont'l Lab'y Prod., Inc.*, 114 F. Supp. 2d at 1003–04 (finding sales evidence failed to raise a genuine dispute of material fact as to secondary meaning where more than half the sales took place after the defendant's first alleged infringement and the plaintiff failed to provide supporting data to place the raw sales figures into a coherent evidentiary context concerning the relevant market).  Thus, the Court has insufficient information to determine if Plaintiff's amount of sales during the relevant time period are indicative of secondary meaning.

  ***Established Place in Market and Number of Customers***.  Plaintiff presents evidence from its former head of business development, Kuzminsky, that by July 2022, San Diego Detox was well-known in the relevant drug rehabilitation marketplace.  (*See* Kuzminsky Decl. 1 ¶ 16.)  However, Plaintiff did not even begin lawful operations until September 2022.  Additionally, Plaintiff presented evidence that it had 30 patients during its first month of operating in September 2022. (SODUF at 22.)  The Court lacks sufficient evidence to contextualize this seemingly low number of customers in the relevant marketplace in a short period of time and lacks information concerning the total number of customers prior to Defendants' alleged infringement.

///

***Proof of Intentional Copying***.  "[E]vidence of deliberate copying is relevant to a determination of secondary meaning." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 844 (9th Cir. 1987) (citations omitted).   Plaintiff presents evidence that Defendants, including Defendant Witt, intentionally copied Plaintiff's San Diego Detox marks following a business meeting in a cigar lounge.  (*See* Doc. 50-5 (Ex. 17) Witt Dep. 43:17–22; Doc. 50-5 (Ex. 25) Hathorn Dep. 40:18–41:5, 41:24–43:11; Doc. 83-2 at 29, 31, 35, 37.)   On the other hand, Defendants present evidence that they adopted the Detox Center of San Diego marks due to advantageous search engine optimization, for distinction from other San Diego providers, and because Defendants Witt and Winberry own facilities with similar names.  (*See* Doc. 50-4 (Ex. 5) Response to Interrogatory No. 3; Doc. 50-4 (Ex. 8) Cornejo Dep. 46:16–21; Doc. 49-16 (Ex. 16) Winberry Dep. 57:3–8.)  Thus, there is conflicting evidence on this point raising a genuine dispute of material fact.

***Evidence of Actual Confusion***.  "[A]ctual confusion is an indicium of secondary meaning[.]"  *Am. Sci. Chem., Inc.*, 690 F.2d at 793.  Plaintiff presents evidence through its employees' declarations of 13 instances of actual confusion, including eight instances from potential or actual referral partners and five from potential or actual customers.  (*See* Hathorn Decl. ¶¶ 10–11; Giorgi Decl. ¶¶ 5–7; Romero Decl. ¶¶ 3–5; Doc. 50-5 (Ex. 15) Romero Dep. 26:22–27:10, 27:12–19, 28:21–29:3; Ackerman Decl. ¶¶ 3–7; Lessard Decl. ¶¶ 5–6.)  However, eight of these instances arose in 2023 after Defendant's alleged first infringement, and only two occurred in October 2022.  (*See id.*)   *See Nguyen v. Smartervitamins Corp.*, Case No. 8:21-CV-00832-DOC-ADS, 2023 WL 6879339, at *9 (C.D. Cal. Oct. 16, 2023) (explaining defendant failed to identify instances of actual confusion before defendant's first alleged infringement).  None of the instances involving potential or actual consumers arose prior to Defendant's first infringement.  (*See* Romero Decl. ¶¶ 3–5; Doc. 50-5 (Ex. 15) Romero Dep. 26:22–27:10, 27:12–19, 28:21–29:3.)

Additionally, the two timely instances of actual confusion involving potential or actual referral partners in October 2022 are "not enough to establish a 'mental recognition in buyers' and potential buyers' minds' between [San Diego Detox's] trade name and a

single source." *Japan Telecom, Inc.*, 287 F.3d at 874 (citing *Self-Realization Fellowship Church*, 59 F.3d at 911). In *Japan Telecom, Inc.*, the plaintiff tried to prove actual confusion through six declarations of business owners in Southern California who explained their confusion between the plaintiff and defendant and their recognition of the plaintiff's company. *See id.* The Ninth Circuit concluded the plaintiff failed to present evidence these business owners formed their recognitions "for any reason other than their personal relationships with Japan Telecom or its president." *Id.* The Ninth Circuit explained that "every small business owner can point to some acquaintances familiar with what he does for a living. None of that means that the relevant buying public makes the same associations." *Id.* at 875–75. Plaintiff's evidence concerning referral partners is even more lacking in that the referral partners do not appear to make representations about their recognition of Plaintiff's business or how they formed that recognition.[23] Thus, this factor is, at best, neutral.

**Balancing of the Factors**. Given the conflicting evidence on the factors above, and Plaintiff's short period of lawful operation prior to Defendants' first alleged infringement, the Court determines there is a genuine dispute of material fact as to whether Plaintiff's San Diego Detox marks acquired secondary meaning before Defendants' first alleged infringement.

### ii. Likelihood of Confusion

#### a) Parties' Arguments

Defendants argue that, without a protectable mark, there cannot be a likelihood of confusion and the Court therefore need not undertake a likelihood of confusion analysis.

---

[23] Defendant Cornejo also explained she experienced three people being confused about the facility names, (*see* Doc. 50-4 (Ex. 8) Cornejo Dep. at 54:12–19, 54:20–24, 55:2–19), but she was not specific as to what type of individuals (consumer, referral partner, etc.) were confused and the timing of these instances. Thus, the Court finds little probative value in Defendant Cornejo's statements on this factor.

46

(Doc. 49-1 at 24–25.)  Alternatively, Defendants argue that even if the Court did consider likelihood of confusion, Dr. Laran's survey assumes Plaintiff's marks are protectable and Plaintiff's employees' self-serving declarations are insufficient to prove secondary meaning.  (*Id.* at 25.)  Plaintiff responds that evidence of likelihood of confusion can support secondary meaning and incorporates its response from its MSJ, detailed below. (Doc. 55 at 30–31.)

In Plaintiff's MSJ, it argues (1) its marks are strong because they have "both inherent and acquired distinctiveness/secondary meaning;" (2) Plaintiff's and Defendants' marks are substantially similar; (3) the parties offer the same services; (4) Defendants willfully infringed Plaintiff's marks; (5) the parties have overlapping markets and marketing channels; (6) purchaser care is low for internet searchers with alcohol or substance use issues looking for the same services in the same area; (7) the parties geographically compete already; and (8) there is overwhelming evidence of actual confusion.  (Doc. 50 at 27–33.)  Defendants respond that (1) the strength of the marks is weak because they are either generic or descriptive and have not acquired secondary meaning; (2) Plaintiff only used the marks for no more than two months prior to Defendants' accepting patients; (3) there is a question of fact regarding whether the literal elements of the alleged marks are protectable and whether the design elements of the logos bear any similarity; (4) Defendants named their business Detox Center of San Diego given Winberry's ownership of Mental Health Center of San Diego and for search optimization purposes; (5) the issue of marketing channel overlap raises a genuine issue of material fact; (6) Plaintiff's purchaser care argument is contradicted by the its likelihood of confusion survey and individuals seeking medical treatment are highly discerning; (7) the likelihood of expansion issue raises a genuine issue of material fact; and (8) the actual confusion issue raises multiple genuine issues of material fact.  (Doc. 54 at 7–9.)  Defendants also respond that Plaintiff presented no evidence of a likelihood of confusion between the parties' logos, which have different design elements and there is a genuine issue of material fact as to a likelihood of confusion between the logos.  (*Id.* at 9–10.)

47

### b) Relevant Law

"[Courts] look to the following eight *Sleekcraft* factors for guidance in assessing the likelihood of consumer confusion: (1) strength of the protected mark; (2) proximity and relatedness of the goods; (3) type of goods and the degree of consumer care; (4) similarity of the protected mark and the allegedly infringing mark; (5) marketing channel convergence; (6) evidence of actual consumer confusion; (7) defendant's intent in selecting the allegedly infringing mark; and (8) likelihood of product expansion." *Pom Wonderful LLC*, 775 F.3d at 1125 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), *abrogated on other grounds by Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003)). "Because the factors are 'fluid,' a 'plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them.'" *Id.* (citing *Surfvivor Media, Inc.*, 406 F.3d at 631). "Because the determination is based on a non-exhaustive, multi-factor, fact-intensive inquiry," the Ninth Circuit has "cautioned against granting summary judgment in these cases." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016) (citing *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1210 (9th Cir. 2012); *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1075 (9th Cir. 2006); and *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901–02 (9th Cir. 2002)). The Ninth Circuit has "cautioned that district courts should grant summary judgment motions regarding the likelihood of confusion sparingly, as careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record." *Thane Int'l, Inc.*, 305 F.3d at 901–02 (citations omitted).

### c) Analysis of Factors

*Strength of Mark*. As explained *supra* at III.B.1.i., there are genuine disputes of material fact as to whether Plaintiff's marks are generic, suggestive, or descriptive and, if descriptive, whether they have acquired secondary meaning. "[A]lthough a suggestive or descriptive mark ... is inherently a weak mark, it 'may be strengthened by such factors as extensive advertising, length of exclusive use, public recognition....'" *Entrepreneur*

*Media, Inc.*, 279 F.3d at 1144 (quoting *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991)).  Even if not a generic mark, as discussed *supra* at III.B.1.i., concerning length of exclusive use and advertising, Plaintiff "has not demonstrated that it has so strengthened its mark as to weigh this factor in favor of finding likely confusion."  *Id.*  Plaintiff will have such an opportunity "to prove that its mark is stronger than it currently appears" at trial.  *Id.*  Thus, this factor is inconclusive at this stage.

**Proximity and Relatedness of the Goods**.  "Related goods (or services) are those 'which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'"  *Rearden LLC*, 683 F.3d at 1212 (quoting *Sleekcraft Boats*, 599 F.2d at 348 n.10).  The Ninth Circuit has adopted a flexible approach to the notion of competition on this factor, for example, two entities "'are not properly characterized as non-competitors' where 'both companies offer products and services relating to the entertainment industry generally, and their principal lines of business both relate to movies specifically and are not as different as guns and toys or computer circuit boards and the Rocky Horror Picture Show.'"  *Id.* (citing *Brookfield*, 174 F.3d at 1056).  Here, the parties provide the same services and are located in the same county.  (*See* SODUF at 6, 9, 25.)  Thus, the Court finds they are direct competitors with related services and this factor weighs in Plaintiff's favor.

**Type of Goods and Degree of Consumer Care**.  "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution....  When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely.  Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1152 (9th Cir. 2011) (citing *Sleekcraft Boats*, 599 F.2d at 353); *c.f. GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000) ("Navigating amongst web sites involves practically no effort whatsoever, and arguments that Web users exercise a great deal of care before clicking on hyperlinks are unconvincing.

Our conclusion is further supported by the Third Circuit's rule that 'the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer.'") (quoting *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 293 (3d Cir. 1991)).

Plaintiff argues that internet searchers exercise little consumer care, patients may show up drunk to detoxification facilities and make decisions at low points in life (*see* Romero Decl. ¶ 3), and cost is not a concern for most patients because ▮ percent of patients have insurance (*see* Hathorn Decl. ¶ 13; Doc. 52-7 (Ex. 6) at 2–4). (Doc. 50 at 31.) Defendants respond that individuals making decisions about medical treatment are highly discerning and the relevant consumer is not an intoxicated individual as evidenced by Dr. Laran's survey criteria. (Doc. 54 at 9.)

While internet users may not exercise a high degree of care as a general matter, the high price of Plaintiff's services deduced from its gross profits during 2022 may indicate at least a modest degree of consumer care. (*See* Doc. 52-6 (Ex. 6) at 2–8; SODUF at 22.) *See Brookfield Communications, Inc.*, 174 F.3d at 1060 (explaining customer expected to be more discerning when purchasing expensive items) (citing *Official Airline Guides*, 6 F.3d at 1393 (noting that confusion was unlikely among advertisers when the products in question cost from $2,400 to $16,000)). However, Plaintiff points out that many of its consumers have insurance coverage. But the Court is not convinced that insurance coverage would necessarily alter consumers' level of care. Beyond the price of Plaintiff's services, the evidence concerning the particular level of care amongst consumers, including an intoxicated person showing up at a facility and a survey pool including those who would recommend themselves, a family member or friend to such services, (*see* Romero Decl. ¶ 3; Laran Report ¶¶ 10, 11), are inconclusive on this factor. Additionally, the parties do not discuss to what extent family or friends of those entering their facilities are the relevant consumer purchasing the services on behalf of another. Because the evidence does not demonstrate that any particular level of care dominates the relevant consumers, this factor is neutral.

50

*Similarity of Marks*.  "[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion."  *GoTo.com, Inc.*, 202 F.3d at 1206.  The Ninth Circuit has "developed certain detailed axioms to guide this comparison: first, the marks must be considered in their entirety and as they appear in the marketplace; second, similarity is adjudged in terms of appearance, sound, and meaning; and third, similarities are weighed more heavily than differences."  *Id.* (internal citations omitted).  "Closeness in meaning can itself substantiate a claim of similarity of trademarks."  *Sleekcraft Boats*, 559 F.3d at 352.  Defendants' and Plaintiff's marks are displayed below, respectively:

 

(Doc. 50-5 (Ex. 19) at 111, 114.)  Both marks contain the words San Diego and Detox, albeit Defendants' mark does so in reverse order and additionally contains the word Center. The parties have not argued the meanings of the logos are distinct or that the words that overlap are pronounced distinctly.  Both logos convey beachy themes, but their coloring and designs appear distinct.  Weighing the similarities more heavily than the differences, *see GoTo.com, Inc.*, 202 F.3d at 1206, a jury could conclude these marks are sufficiently similar as to raise a likelihood of confusion.

*Marketing Channel Convergence*.  "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products."  *Pom Wonderful LLC*, 775 F.3d at 1130 (citing *Nutri/System, Inc. v. Con–Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987)).  "However, this factor becomes less important when the marketing channel is less obscure.  Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion."  *Network Automation, Inc.*, 638 F.3d at 1152 (citing *Playboy Enterprises, Inc. v. Netscape*

*Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) ("Given the broad use of the Internet today, the same could be said for countless companies.  Thus, this factor merits little weight.")).  Both facilities are located in San Diego County, use the internet for marketing, have many customers from Southern California, and rely on referrals from other facilities. (*See* SODUF at 6, 25; Hathorn Decl. ¶ 12; Doc. 49-14 (Ex. 12) Hathorn Dep. 59:22-25, 77:11-20; Doc. 50-4 (Ex. 8) 14:2–16:7, 78:15–19, 81:23–82:1.)  While this factor merits little weight, it favors Plaintiff.

**Actual Confusion**.  "[A] showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion." *Playboy Enterprises, Inc.*, 354 F.3d at 1026.  "[S]urvey evidence and retailer testimony are primarily relevant to the existence of actual confusion." *Levi Strauss & Co.*, 778 F.2d at 1360.  "[N]on-consumer confusion may also be relevant to the 'likelihood of confusion' inquiry in three specific and overlapping circumstances—namely where there is confusion on the part of: (1) potential consumers; (2) non-consumers whose confusion could create an inference that consumers are likely to be confused; and (3) non-consumers whose confusion could influence consumers." *Rearden LLC*, 683 F.3d at 1214.

As explained *supra* at III.B.1.i.e.3., Plaintiff presented evidence of 13 instances of actual confusion, including eight instances from potential or actual referral partners and five from potential or actual consumers.  Those instances involving potential or actual referral partners are relevant to the likelihood of confusion analysis because referral partners are "non-consumers whose confusion could influence consumers." *Rearden LLC*, 683 F.3d at 1214.  Additionally, Plaintiff presented Dr. Laran's survey, which found a net confusion rate between 14.4 and 32.4 percent, including 18.8 percent amongst respondents living in Southern California.  (*See* Laran Report ¶¶ 8–9.)  *See Fortune Dynamic, Inc.*, 618 F.3d at 1036–38 (finding survey with net 11% confusion between test and control group created a genuine dispute of material fact as to likelihood of confusion); *Thane Int'l, Inc.*, 305 F.3d at 902–03 (finding survey showing 27.7% of respondents were confused as to the source of plaintiff's products due to the similarity to defendant's name or logo sufficient

to raise genuine dispute of material fact as to likelihood of confusion); *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1265–66 (9th Cir. 2001) (finding genuine dispute of material fact as to likelihood of confusion where, in part, plaintiff presented a survey showing 85 percent of respondents expressing apparent confusion as to ownership of an establishment and evidence from several witnesses expressing such confusion). Thus, this evidence creates a genuine dispute of material fact as to a likelihood of confusion.

*Defendants' Intent*.  The Ninth Circuit has "emphasized the minimal importance of the intent factor."  *GoTo.com, Inc.*, 202 F.3d at 1208.  However, "[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft Boats*, 599 F.2d at 354.  "Where an alleged infringer chooses a mark he knows to be similar to another, one can infer an intent to confuse."  *Entrepreneur Media, Inc.*, 279 F.3d at 1148 (citing *Official Airline Guides*, 6 F.3d at 1394).

As explained *supra* at III.B.1.i.e.3., there is conflicting evidence concerning whether Defendants intentionally copied Plaintiff's marks.  Additionally, there is evidence Defendants were aware Hathorn was going to use the San Diego Detox name for his facility when they developed the name Detox Center of San Diego.  (*See* Doc. 50-4 (Ex. 8) Cornejo Dep. 49:8–12; Doc. 50-5 (Ex. 17) Witt Dep. 43:17–22.)  Defendant Cornejo also conceded that even if a survey expert were correct that people are likely to be confused by the names, that would not lead her to change Detox Center of San Diego's name.  (*See* Doc. 50-4 (Ex. 8) Cornejo Dep. at 104:7–14.)  While this factor is of minimal importance, there is certainly a genuine dispute of material fact as to whether Defendants intended to confuse consumers.

*Likelihood of Product Expansion*.  "[A] 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing.  When goods are closely related, any expansion is likely to result in direct competition.  Where two companies are direct competitors, this factor is unimportant." *Network Automation, Inc.*, 638 F.3d at 1153 (internal quotation and citations omitted). Where "[n]either party presented evidence regarding the likelihood of expansion," *Lahoti*,

53

636 F.3d at 509, this factor is neutral.  Because the parties have not presented evidence of a strong possibility of business expansion, and they are direct competitors, this factor is neutral.

*Balancing of the Factors*.  Given the evidence presented concerning the proximity and relatedness of the goods, similarity and strength of the marks, marketing channel convergence, actual confusion, and Defendants' intent, the Court concludes there is a genuine dispute of material fact as to likelihood of confusion.

## 2.  California Trade Name Infringement and Common Law Service Mark Infringement (Second and Third Causes of Action)

Defendants argue Plaintiff's California trade name infringement claim fails because Plaintiff (1) does not present credible evidence of secondary meaning or likelihood of confusion and (2) its FBN, which issued before it was engaged in business, cannot make up for that failure.  (Doc. 49-1 at 25–29.)  Defendants argue that the absence of a valid, protectable trademark is dispositive of Plaintiff's service mark infringement claim under California common law.  (*Id.* at 30.)

"[A] plaintiff who establishes claims under the Latham Act also satisfies the elements for claims of common law trademark infringement and unfair competition under California … state laws."  *Century 21 Real Est., LLC v. Ramron Enterprises*, No. 1:14-CV-00788-AWI, 2015 WL 521350, at *7 (E.D. Cal. Feb. 9, 2015) (citing *Rearden LLC*, 683 F.3d at 1221 (claims for trademark infringement and unfair competition under California law are "subject to the same legal standards" as Lanham Act claims)); *see also 6th St. Partners, LLC v. Bd.*, No. CV 21-6595-RSWL-JPRx, 2022 WL 1570630, at *5 (C.D. Cal. Mar. 17, 2022) ("Claims for trademark infringement under California Business and Professions Code section 14245, common law trademark infringement, and unfair competition require the same showing as claims for trademark infringement under the Lanham Act.") (citation omitted); *Crafty Prods., Inc. v. Michaels Companies, Inc.*, 389 F. Supp. 3d 876, 884 (S.D. Cal. 2019) ("Claims for trademark infringement under California law are subject to the same legal standards as Lanham Act claims.") (internal quotation

54

marks and citations omitted).  "California common law trademark claims are evaluated by the same standards as federal trademark claims."  *Good Meat Project v. GOOD Meat, Inc.*, Case No. 23-cv-04145-RFL, 2024 WL 1083462, at *12 (N.D. Cal. Feb. 12, 2024) (citing *Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1100 (9th Cir. 2004)).  Thus, for the reasons discussed in *supra* III.B.1.i, there are genuine disputes of material fact concerning Plaintiff's state trade name infringement and common law service mark infringement claims.

For all the reasons discussed above, Defendants' MSJ (Doc. 49-1) and Plaintiff's MSJ (Doc. 50) are **<u>DENIED</u>**.

### C. Preliminary Injunction

#### 1. Improper Pleading

Defendants argue Plaintiff's motion for permanent injunction should be disallowed or Defendants should be granted an opportunity to present complete ten-page objections to each motion because Plaintiff did not provide a memorandum in support of each motion it brings under Civil Local Rule 7.1(f)(1).  (Doc. 54 at 10.)  Plaintiff responds that filing a separate brief was prohibited.  (Doc. 62 at 6 n.2.)  Civil Local Rule 7.1(h) "requires a party who files multiple motions noticed for the same hearing date to file one combined memorandum of points and authorities, which may not exceed twenty-five (25) pages in length, or obtain prior leave of the Court to file a longer memorandum."  *Orthopaedic Hosp. v. Encore Med. L.P.*, Case No. 19-CV-970 JLS (AHG), 2021 WL 1966124, at *1 (S.D. Cal. May 6, 2021).  Accordingly, Plaintiff's motions were not improper.

#### 2. Preliminary Injunction Factors

To obtain a preliminary injunction, Plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1247 (9th Cir. 2013) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The "[l]ikelihood of success on the merits 'is the most important' *Winter* factor[.]"

*Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc)).

### i. Likelihood of Success on the Merits

"As to its trademark infringement claim, to establish a likelihood of success on the merits [Plaintiff] must show that it is '(1) the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark.'" *Herb Reed Enterprises, LLC*, 736 F.3d at 1247 (quoting *Grocery Outlet, Inc. v. Albertson's, Inc.*, 497 F.3d 949, 951 (9th Cir. 2007) (per curiam)).   Based on the Court's review of the evidence and arguments the parties presented in their cross MSJs and discussed *supra* at III.B.1, the Court finds Plaintiff established a likelihood of success on the merits.   Specifically, for the valid, protectable trademark prong, Plaintiff is likely to prove its marks are suggestive and are therefore entitled to protection.   In particular, Plaintiff is likely to prove the word Detox in San Diego Detox requires a non-instantaneous mental leap in the mind of the relevant consumer between the name and Plaintiff's services.   *See Japan Telecom, Inc.*, 287 F.3d at 873.   For the likelihood of confusion prong, the evidence appears to favor Plaintiff.   Thus, Plaintiff has established a likelihood of success on the merits.

### ii. Irreparable Harm

Plaintiff argues that it will suffer irreparable harm absent a preliminary injunction because, due to Defendants' alleged infringement, it has "lost control over its reputation," which is being associated with Defendants' negative reputation, and Dr. Laran estimates lost sales between 14.2% and 32.4%, consistent with the level of consumer confusion. (Doc. 50 at 33–34.)   Defendants respond Plaintiff's assertions lack a solid foundation and notes the existence of Winberry's business, Mental Health Center of San Diego, which predates the businesses at issue in this case.   (Doc. 54 at 11.)

"The second requirement for injunctive relief is that the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief." *Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877, 897 (N.D. Cal. 2019) (citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1133 (9th Cir. 2013)).   "Evidence of loss of control over business reputation

56

and damage to goodwill could constitute irreparable harm." *Herb Reed Enterprises, LLC*, 736 F.3d at 1250. The district court's analysis of irreparable harm must be "grounded in … evidence." *Id.*

Plaintiff has pointed to evidence concerning a loss of its business reputation and damage to goodwill, including from declarations and depositions of its employees. *See Herb Reed Enterprises, LLC*, 736 F.3d at 1250. Specifically, Lessard and Kuzminsky submitted declarations explaining Plaintiff's reputation in Southern California as a best-in-class facility. (*See* Chantal Decl. ¶ 10; Kuzminsky Decl. 1 ¶¶ 17–18.) Lessard also explained that Defendant "has a horrible reputation amongst referral partners, including because it is well-known (or believed) in the relevant community that Ryan Witt is still an active drug user despite being upper management level of Detox Center of San Diego." (Chantal Decl. ¶ 10.) Lessard claimed to observe Witt under the influence during a meeting seven or eight months prior to her deposition. (*See* Doc. 50-5 (Ex. 12) Lessard Dep. 29:5-30:9.) Romero explained that Plaintiff is suffering irreparable harm from being associated with an unrelated facility with a negative reputation in their relevant community. (*See* Doc. 55-4 (Ex. 29) Romero Decl. ¶ 2.) Plaintiff also points to evidence from Dr. Laran's likelihood of confusion survey demonstrating potential lost sales between 14.2 and 32.4 percent. (*See* Laran Report ¶ 53.) *See Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841 ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.") (citation omitted). Accordingly, Plaintiff has pointed to sufficient evidence to raise a likelihood of irreparable harm.

### iii. Balance of Hardships

Plaintiff argues the balance of hardship tips sharply in its favor as Defendants are riding "riding on the coattails" of Plaintiff's marketing and it is far less hardship for Defendants to change their name. (Doc. 50 at 34–35.) Defendants argue an injunction would cause them significant hardship by requiring them to make substantial changes to their online content, electronic communication with patients, and overall identity. (Doc. 54 at 11.)

The Court agrees with Plaintiffs that the balance of hardship tips sharply in their favor.  Plaintiff has presented evidence of its significant marketing spend and evidence supporting Defendants' potential intentional copying and intent to benefit from Plaintiff's marketing.  (*See supra* III.B.; Doc. 50-5 (Ex. 12) Lessard Dep. 30:10–17.)  Defendants have not pointed to any significant marketing efforts on their part.  *C.f. Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877, 899 (N.D. Cal. 2019) ("The hardship to KBI in granting an injunction and forcing it to undergo a massive rebranding of a name it has built up for about nine years would therefore be much greater than the hardship to KHB in denying an injunction and thereby maintaining the status quo.").  Thus, the balance of hardship tips in Plaintiff's favor.

### iv.  Public Policy

Plaintiff argues public policy strongly favors an injunction because the public benefits from avoiding likely confusion and respecting trademarks.  (Doc. 50 at 35.)  Defendants argue an injunction is against public policy because it allows businesses to monopolize descriptive terms.  (Doc. 54 at 11.)

Trademark law "protect[s] the public from confusion by accurately indicating the source of a product."  *State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 715 (9th Cir. 2005).  "Preventing consumer confusion serves the public interest and there is a strong policy in favor of protecting rights to trademarks."  *Stark v. Diageo Chateau & Estate Wines Co.*, 907 F. Supp. 2d 1042, 1067 (N.D. Cal. 2012).  Given Plaintiff's evidence concerning a likelihood of consumer confusion, the Court determines public policy favors a preliminary injunction.

### v.  Bond

Plaintiff argues no bond is required for a preliminary injunction here.  (Doc. 50 at 35.)  "Rule 65(c) invests the district court 'with discretion as to the amount of security required, if any.'"  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)).  "The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm

to the defendant from enjoining his or her conduct." *Id.* "[T]he likelihood of success on the merits, as found by the district court, tips in favor of a minimal bond or no bond at all." *Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985); *see also cPanel, LLC v. Asli*, Case No. 3:22-cv-01963-IM, 2024 WL 35674, at *15 (D. Or. Jan. 3, 2024) (imposing no bond where Defendant did not seek a bond and willfully impinged Plaintiff's intellectual property). The parties have not sufficiently briefed the issue of potential damages or lack thereof if the preliminary injunction is wrongly imposed. Therefore, the Court cannot determine in its discretion whether a bond is necessary at this time.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' MSJ (Doc. 49-1) and Plaintiff's MSJ (Doc. 50) are **DENIED**. Plaintiff's request for a preliminary injunction is **GRANTED**. However, Plaintiff has not submitted a proposed order granting Plaintiff a preliminary injunction. Plaintiff must file a proposed order with a proposed preliminary injunction and a motion (1) explaining why the preliminary injunction language used is reasonable and appropriate and (2) addressing whether a bond is necessary on or before **July 19, 2024**. Defendants may respond on or before **July 26, 2024**. The parties' briefing should be no more than 7 pages each.

**IT IS SO ORDERED.**

DATE:  July 9, 2024

HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE